Argued October 4, reversed and remanded December 10, 1973, petition for reconsideration denied January 16, petition for review denied March 5, 1974

# STATE OF OREGON, *Respondent, v.* ROBERT PARIS CORBIN, JR. (No. 73-3-C), *Appellant.*

516 P2d 1314

*Walter L. Cauble* and *Donald H. Coulter,* Grants Pass, argued the cause and filed the briefs for appellant.

*Robert M. Burrows,* District Attorney, Grants Pass, argued the cause and filed the brief for respondent.

Before SCHWAB, Chief Judge, and LANGTRY and FORT, Judges.

LANGTRY, J.

Defendant was convicted of murder of his wife. ORS 163.115. His defense was based on the assertion that he was guilty only of manslaughter. ORS 163.125 (1)(b). On appeal he raises two principal issues. (1) He asserts that it was error not to suppress evidence heard by a psychiatrist in an examination not obtained pursuant to prescribed statutory procedures. (2) He challenges the propriety of a jury instruction relating to emotional disturbance as an element of his manslaughter defense.

Defendant committed criminal homicide. ORS 163.-005. The sole question for the jury was whether the crime was murder or manslaughter.

At 1:39 a.m. December 30, 1972 the Grants Pass Police Department received a phone call from a man who identified himself as Mr. Peck of Weed, California. Mr. Peck advised the police dispatcher that his son-in-law, the defendant, had just called him and stated that he had shot his wife and was going to kill himself.

Officers on arriving at defendant's house got no response from within though they knocked loudly and identified themselves. They broke into the house and found defendant, lying wounded and unconscious on a bed, next to the body of his dead wife. Shortly, defendant regained consciousness and began to speak to

the officers, one of whom he had previously been acquainted with on a nonpolice, business level. He began to make incriminating statements to the effect that he had killed his wife and wished that he too were dead. The officer interrupted and warned him of his *Miranda*[①] rights. He responded by stating, " 'I know my rights. You don't need to tell them to me,' " and continued to volunteer incriminating evidence. Defendant then attempted to stab himself with a hunting knife he had concealed underneath himself, but was thwarted by the police.

Defendant was then taken to a hospital where his wound was examined and treated. The wound was shown by evidence to be caused by a .22 caliber slug that had passed through defendant's shoulder area and had been fired from a distance of 12 to 24 inches from the point of entry. The same morning at 9 a.m. he was again questioned by police and gave a statement. That afternoon while still under guard in the hospital he made a further statement that was recorded on video tape and shown to the jury. During this statement he was again informed of his *Miranda* rights.

After defendant made the video tape statement, at the suggestion of the district attorney he was asked by an officer if he would be willing to see a psychiatrist. Defendant agreed. The district attorney made arrangements for Dr. Gardner, a psychiatrist, to examine defendant. Dr. Gardner conducted the examination that evening in defendant's hospital room. He did not inform defendant of his rights. The doctor submitted a written report to the district attorney, and testified. His opinion was that defendant was not suffering from

① Miranda v. Arizona, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974 (1966).

an extreme emotional disturbance at the time of the homicide.

Defendant told officers and Dr. Gardner that he had come home that evening, had an argument with his wife and had slapped her. He then retreated into the bedroom and lay down to compose himself. His wife entered the bedroom and, pointing a .22 caliber rifle at defendant, told him to get out. Defendant said he grabbed for the gun and it went off, striking him in the area of his shoulder. He then took the gun and as his wife climbed across the bed he fired two shots, both producing fatal wounds. The state's evidence, while not directly contradicting this version, established several inconsistencies in it.

There was other evidence introduced to show that, for several months prior to the shooting, defendant and his wife were having marital difficulties. A witness testified that about an hour before the shooting the defendant told him he was "* * * 'tired of hassling' " and was "* * * 'going to end it tonight.' "

(1). Defendant challenges the trial court's refusal to suppress the evidence obtained by Dr. Gardner's psychiatric examination. Defendant argues that the only way the state may obtain a psychiatric examination is by obtaining a court order pursuant to ORS 161.315. The state counters that, since the defendant voluntarily agreed to talk to the psychiatrist several hours after knowingly waiving his *Miranda* rights, there was no basis for suppressing the results of the examination, relying on *State v. Ruiz,* 251 Or 193, 444 P2d 32 (1968), and *State v. Nelson,* 162 Or 430, 92 P2d 182 (1939).

ORS 163.125 provides:

"(1) Criminal homicide constitutes manslaughter when:

"* * * * *

"(b) A homicide which would otherwise be murder is committed under the influence of extreme emotional disturbance, which disturbance is not the result of his own intentional, knowing, reckless or criminally negligent act, and for which disturbance there is a reasonable explanation; or

"* * * * *

"(2) For the purposes of paragraph (b) of subsection (1) of this section, the reasonableness of the explanation for the disturbance shall be determined from the standpoint of an ordinary person in the actor's situation under the circumstances as the actor reasonably believes them to be.

"* * * * *"

ORS 163.135 provides:

"(1) The defendant shall not introduce in his case in chief expert testimony regarding extreme mental or emotional disturbance under ORS 163.125 unless he gives notice of his intent to do so.

"* * * * *

"(4) After the defendant files notice as provided in this section, the state shall have the right to have at least one psychiatrist of its selection examine the defendant in the same manner and subject to the same provisions as provided in ORS 161.315."

ORS 161.315 provides:

"Upon filing of notice or the introduction of evidence by the defendant as provided in subsection (3) of ORS 161.309, the state shall have the right to have at least one psychiatrist of its selection examine the defendant. The state shall file notice with the court of its intention to have the defendant examined * * *."

For our discussion of this issue, ORS 161.315 is the key statute; the others provide a frame of reference. ORS 161.315 was enacted in 1971 as part of the revision of the criminal code. Oregon Laws 1971, ch 743, § 42. The commentary to the proposed code indicates that this section is basically a codification of the holding of *State v. Phillips,* 245 Or 466, 422 P2d 670 (1967). In addition, the statute gives the defendant the right to object to the psychiatrist chosen by the state.

*State v. Phillips,* supra, dealt with this subject succinctly:

"This court has never decided whether the state has a right to a mental examination of a defendant who pleads not guilty by reason of insanity where defendant has refused to consent to such an examination. In *State v. Nelson,* 162 Or 430, 451-452, 92 P2d 182 (1939), this question was raised but the court ruled that defendant had consented to the examination. The court said in what clearly was dicta:

" '* * * Nevertheless, it is held that no constitutional right of the defendant is violated even if the examination is against the will and without the consent of the defendant.'

The great weight of authority is that the state is entitled to such an examination where a plea of insanity has been made. *State v. Mulrine,* 183 A2d 831 (Del Sup 1962); *People v. Carpenter,* 13 Ill2d 470, 150 NE2d 100, 104-105 (1958); *State v. Grayson,* 239 N C 453, 80 SE2d 387, 390 (1954). In the *Grayson* case the court stated as follows:

" '* * * The constitutional privilege against self-crimination in history and principle seems to relate to protecting the accused from the process of extracting from his own lips against his will an admission of guilt, and in better reasoned cases it does not extend to the exclusion of his

body or of his mental condition as evidence when such evidence is relevant and material, even when such evidence is obtained by compulsion. * * *'

If the rule were otherwise there would be no way for the state to rebut a plea of insanity after the defendant had put his mental condition in question by such a plea. No error was committed in allowing the defendant to be examined by the state's psychiatrist nor in permitting him to testify as to his opinion of defendant's mental condition at the time of the crime.

"The judgment of the trial court is affirmed." 245 Or at 475-76.

*State v. Nelson,* 162 Or 430, 92 P2d 182 (1939), involved testimony of a psychiatrist who examined the defendant on behalf of the state. The court held that the testimony did not violate the defendant's right against self-incrimination because he had consented to the examination. Prior to the examination defendant Nelson had told the doctor that his attorneys had instructed him not to talk to anyone without their being present. However, he had then voluntarily and without coercion talked freely with the doctor and permitted the examination.

The facts of *Nelson* might not today support the conclusion that the defendant had voluntarily waived his Fifth Amendment privilege. *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974 (1966). But the case stands for the proposition that a defendant can waive those rights and consent to a psychiatric examination.

Defendant asserts that *Nelson* predates the enactment of ORS 161.315, hence, it is not controlling. He argues that, the legislature's having established a pro-

cedure by which the state may obtain a psychiatric examination, this procedure is now the sole means therefor.

■ No such stricture is stated in the statute as to a "consent examination." The commentary indicates the statute is a codification of *State v. Phillips,* supra. *Phillips* in turn repeats and reaffirms the holding of *Nelson* which specifically held that a "consent examination" was admissible. We conclude that the existence of the statute is no bar to a "consent examination."

■ In *Shepard v. Bowe,* 250 Or 288, 442 P2d 238 (1968), the court held that a defendant, being examined pursuant to court order after raising the issue of insanity, could not be ordered to answer questions, the answers of which would be incriminating, nor could the court order defendant's attorney not be present at the examination. This decision is relevant here for the conclusion that the psychiatrist examining the defendant for the state is for all purposes an officer of the state and no different than any police officer when questioning a defendant. Therefore, a valid consent to a psychiatric examination may not be obtained without the defendant's knowingly and voluntarily waiving those rights enumerated in *Miranda.*

In this case defendant raises the question of whether the *Miranda* warning given him several hours before he was examined by the psychiatrist was sufficient to apprise him of his right to refuse to talk to the psychiatrist or to have an attorney present.

In *State v. Anderson,* 8 Wash App 782, 509 P2d 80 (1973), the Washington Court of Appeals found that, where the examining psychiatrist had warned defendant of his *Miranda* rights prior to conducting his

examination, the state had satisfied its "heavy burden" imposed by *Miranda.*

In *State v. Ruiz,* 251 Or 193, 444 P2d 32 (1968), the court stated:

"The sole issue presented by this appeal is whether the defendant understandingly and voluntarily made the confession which was admitted in evidence.

"The defendant contends that under *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L ed 2d 694 (1966), the proceedings surrounding the giving of the confession must show that the party confessing stated himself, after being properly warned, 'I have no desire to remain silent, and, also, I do not wish an attorney.' " 251 Or at 194.

The court then discussed the language of *Miranda* and concluded:

"* * * We think it is clear that the majority was stating that, if the suspect was properly warned and he understood the warnings, then he had waived his rights but could recall them at any time during the interview and again make them effective as to subsequent interrogations. Otherwise stated, after the warnings are given and knowingly and understandingly understood by the suspect, the burden is upon the suspect to invoke his known rights." 251 Or at 195.

The state contends that this decision controls the case at bar.

*Ruiz* did not involve a factual situation analogous to this case. It stands for the proposition that a defendant need not say "I waive my Miranda rights" in order for there to be a knowing and voluntary waiver. The principle enunciated will usually extend to the situation where police officers other than those who issued the *Miranda* warning subsequently interrogate a

defendant. In this case, however, there is little indica-
tion that defendant knew any statements he made to the
psychiatrist could be used against him, or that he had
a right to an attorney's being present during the exam-
ination.

At the hearing on the motion to suppress, the trial
court stated:

> "The Court is of the opinion that all of the testi-
> mony which it has heard today was given after
> proper warnings of the Miranda rights, where a
> waiver of those rights was voluntary by the De-
> fendant. The motion to suppress will be denied, and
> the order of the Court will be that the testimony
> and evidence submitted was voluntary, was after
> proper advice, and an order may be so entered."

■ Insofar as this is a finding of fact it is binding
on this court. *Ball v. Gladden,* 250 Or 485, 443 P2d 621
(1968). However, it is not binding on this court insofar
as determining whether as a matter of law a defendant
must be given a *Miranda* warning by the examining
psychiatrist or someone else to the effect that his
"rights" apply equally to the psychiatric examination
as well as to police interrogation.

■■ The key reason for requiring that the psychi-
atrist repeat such a warning is to dispel any possibility
that the defendant may believe that statements made to
the psychiatrist would not or could not be used in court
against him. The reasons for this possible misappre-
hension lie in the vagueness of what is protected by the
confidentiality of the doctor-patient relationship. Even
more compelling is the need to dispel any belief that
statements made to the psychiatrist would be for the
defendant's own good. The defendant must be aware
that the psychiatrist is employed by his adversary and
is not primarily his healer. *Cf. State v. Phillips,* supra,

245 Or at 471, 472. For these reasons we feel that as a matter of law a defendant must be warned that his *Miranda* rights apply to the psychiatric examination. We conclude that the court erred in not suppressing the results of the psychiatric interview.

Inasmuch as the case must be remanded for further proceedings, we discuss below defendant's other contentions on appeal.

■ (2). The defendant excepted to two related jury instructions concerning the elements of manslaughter. They were:

"You are instructed that not every emotional disturbance is an extreme emotional disturbance in the eyes of the law. To be an extreme emotional disturbance under the law of Oregon, so as to allow mitigation to manslaughter that which would otherwise be murder, requires that there be both an unexpected and provocative event which triggers the Defendant into committing the homicide."

"You are instructed that it is not enough that the event merely be provocative resulting in a triggering of the homicide. Likewise you are instructed that it is not enough that the event be merely unexpected as the law requires that the event be both unexpected and provocative."

The alleged error must be viewed in light of the testimony given by Dr. Gardner:

"Q Doctor, if we assume for purposes of these questions that to be an extreme emotional disturbance, or for it to be an extreme emotional disturbance in the eyes of the law, not in the eyes of you or I, but in the eyes of the law, it has to be an event which is unexpected and provocative which then triggers the person into committing the act, and also one which is not created by the person himself, do you have an opinion as to whether or not Mr.

Corbin was under the influence of such an extreme emotional disturbance, the one that I have described, the unexpected and provocative event which triggers, at the time of shooting his wife?

"A   I have an opinion, yes.

"Q   Would you state that opinion, please?

"A   I don't believe he was under the influence of such an extreme emotional disturbance so as to have not been able to shoot her.

"* * * * *

"A   The trouble with his marriage I don't believe was unexpected.

"Q   If he made these statements that I just asked you about, would that indicate that they clearly weren't unexpected?

"A   Yes."

The instructions to which exception was taken related to this evidence. We think they prejudiced defendant's defense.

The part of ORS 163.125 applicable at bar was quoted supra. The language in the instructions that is specifically objected to is the requirement that the extreme emotional disturbance be triggered by "an unexpected and provocative event." The commentary of the Criminal Law Revision Commission, which prepared ORS 163.125 in the form it was in when introduced in the legislature, carries no implication that the commission had any intent to require that the "extreme emotional disturbance" be caused by "an unexpected and provocative event." See quotations therefrom in *State v. O'Berry,* 11 Or App 552, 503 P2d 505 (1972), Sup Ct *review denied* (1973). The language of the statute itself and of the commentary indicates that the question of whether the extreme emotional disturbance has "reasonable explanation" is entirely for the jury

to decide without any requirements other than those enumerated in the statute. ORS 163.125:

"[(1)] (b) * * * [The] disturbance is not the result of [the defendant's] * * * own intentional, knowing, reckless or criminally negligent act * * *"; and

"(2) * * * the reasonableness of the explanation for the disturbance shall be determined from the standpoint of an ordinary person in the actor's situation under the circumstances as the actor reasonably believes them to be."

■ The requirement mentioned in (1) (b) above was not included in the draft prepared by the Criminal Law Revision Commission but was added as an amendment in the Senate Committee hearings on the proposed law. Senate Criminal Law and Procedure Committee Minutes, March 5, 1971, p 7. Our inquiry is whether the statute limits the defense of extreme emotional disturbance to cases involving "unexpected and provocative events."

In *State v. O'Berry,* supra, 11 Or App at 556, we stated:

"* * * ORS 163.125 (1) (b) allows mitigation to manslaughter of that which otherwise would be murder where some unexpected and provocative event triggers the actor into committing the homicide * * *."

That case was a felony-murder prosecution. The defendant contended that the jury should have been instructed on the elements of manslaughter because the evidence showed he was afflicted with an extreme emotional disturbance when a girl resisted his attempts to rape her. The holding of *O'Berry* was that felony murder could not be reduced to manslaughter given the facts of that case. The quoted construction of ORS

163.125 was unnecessary to that decision, and that language must be read in context with the following language in the same paragraph:

"* * * [I]f he [defendant] is to be allowed mitigation on account of his emotional disturbance, it must come by way of proof that he was mentally disturbed in such a way that he was not responsible for his criminal actions * * *." 11 Or App at 556.

The language in *O'Berry* relating to "unexpected and provocative" events was language prompted by the defendant's contention in that case. As such, it was an unfortunate choice of words that appeared to limit the elements of manslaughter beyond the point intended by the legislature or provided by the statute. As it may be so interpreted, it is overruled. Aside from the specific limitations of ORS 163.125 (1)(b) and (2) discussed above, the statutory scheme puts the decision as to the reasonableness of the explanation for the extreme emotional disturbance completely in the hands of the jury.[2] Cf. *State v. Siens,* 12 Or App 97, 504 P2d 1056, Sup Ct *review denied* (1973).

■ Defendant challenges the trial court's refusal to suppress statements and physical evidence obtained as a result of the police's breaking into defendant's home, without a search warrant, after the telephone call was received. They had probable cause to enter. *State v. Poole,* 11 Or App 55, 500 P2d 726, Sup Ct *review denied* (1972); *State v. Poteet,* 9 Or App 231 495 P2d 783, Sup Ct *review denied* (1972). The fact that they probably saved the defendant's life, which they knew was in danger, is sufficient demonstration of exigent circumstances to permit them to proceed without first ob-

[2] We note that Oregon State Bar, Uniform Jury Instruction No. 410.17 is consistent with our viewpoint.

taining a search warrant. *State v. Keith*, 2 Or App 133, 465 P2d 724, Sup Ct *review denied* (1970).

A remaining assignment of error relates to an instruction on circumstantial evidence that defendant conceded on oral argument is controlled by *State v. Gill*, 243 Or 621, 415 P2d 166 (1966).

Reversed and remanded.