Argued August 22, affirmed September 23,
petition for reconsideration denied November 13, 1974,
petition for review allowed January 21, 1975

In the Matter of Christopher and Damon Martin,
Minor Children.

STATE EX REL JUVENILE DEPARTMENT
OF CLATSOP COUNTY, *Respondent, v.*
MARTIN (No. 454-J), *Appellant.*

526 P2d 647

*Hayes Patrick Lavis,* Astoria, argued the cause for appellant. On the brief were Bradley C. Grove and Anderson, Fulton, Lavis & Van Thiel, Astoria.

*William T. Park,* Deputy District Attorney, Astoria, argued the cause for respondent. With him on the brief was Frank J. Coumont, District Attorney, Astoria.

Before SCHWAB, Chief Judge, and LANGTRY and THORNTON, Judges.

LANGTRY, J.

This is an appeal by Clyde Theodore Martin of a juvenile court judgment terminating his parental

rights. At a hearing held in accordance with ORS 419.525, the court allowed the state to introduce into evidence—in its case-in-chief—testimony regarding Mr. Martin's past mental condition as it related to his present mental state and potential for rehabilitation.

This testimony was by four physicians—Drs. Rawls, Russell, White and Lyons. The record indicates that during the time to which the testimony related Dr. Russell was Mr. Martin's "treating physician," Dr. Rawls had been Clatsop County Health Officer and had seen and treated Mr. Martin in connection with commitment proceedings, while Dr. White and Dr. Lyons—both employes of the Oregon State Hospital—"treated" him during his commitment to that institution. Mr. Martin also took the stand in his own defense and testified on both direct and cross-examination to his past and present mental condition as well as his plans for future treatment.

The court found that the defendant was an unfit parent and terminated his parental rights. It specifically found in a written opinion that Mr. Martin was a victim of chronic schizophrenia, paranoid type, and would continue to be so for the rest of his life.

In its opinion, the court noted that it had taken judicial notice of Mr. Martin's condition by way of acknowledging three prior commitment proceedings— in one of which the trial judge had sat—together with the "general or abstract testimony of the various psychiatrists who testified herein concerning the characteristics of chronic paranoid schizophrenia," and that these facts constituted a sufficient basis for the termination order. The court additionally concluded that there was an alternate basis founded "upon the

testimony of the various treating doctors that testified * * *. This is so in spite of the claimed privileged nature of this testimony * * *."

█ Defendant raises two issues in this appeal. The first is that he was improperly prevented from asserting the physician-patient privilege created by ORS 44.040 (1)(d) when he objected to the admission of the testimony of the four physicians noted above, and was prejudiced by the admission of that evidence. The second is the claim that ORS 419.525 is constitutionally defective, depriving defendant of the due process of law guaranteed by the United States and Oregon Constitutions by (1) failing to provide for jury trials in parental-right termination hearings, and (2) permitting "unfitness" to be established by a preponderance of evidence rather than requiring it to be proven beyond a reasonable doubt. This second challenge was not presented below; we will not consider it here. *State ex rel Juv. Dept. v. Patton,* 5 Or App 450, 485 P2d 653 (1971); *City of Portland v. Trumbull Asphalt,* 2 Or App 1, 463 P2d 606, Sup Ct *review denied* (1970).

The question, then, is whether the statutorily created right to bar the admission of relevant evidence offered in the form of testimony by a physician should be available to a parent involved in a juvenile proceeding initiated to consider the termination of parental rights.

ORS 44.040 (1)(d) provides:

"(1)   There are particular relations in which it is the policy of the law to encourage confidence, and to preserve it inviolate; therefore a person cannot be examined as a witness in the following cases:

"* * * * *.

"(d) Subject to ORS 44.610 to 44.640, a regular physician or surgeon shall not, without the consent of his patient, be examined in a civil action, suit or proceeding, as to any information acquired in attending the patient, which was necessary to enable him to prescribe or act for the patient."

If, in fact, termination proceedings under ORS 419.525 are "civil" actions, and if the four physicians testified as to "information acquired in attending the patient, which was necessary to enable [them] to prescribe or act for the patient," the conclusion that the disputed evidence fell within the limits of the protection provided by the privilege appears to be inescapable.

■■ The state argues that a requisite to the existence of the privilege as defined in ORS 44.040 (1)(d) is that the "patient" himself must have consulted the physician for treatment or for diagnosis looking toward treatment, suggesting that, because in this case the physician witnesses were either court appointed to determine if Mr. Martin was committable or were employed by the state at the Oregon State Hospital, no privileged relationship ever arose. This argument is advanced despite the fact that each of the physicians testified to having "treated" Mr. Martin at some time. Further, review of the record discloses that at least one of the physicians—Dr. Russell—was actually contacted and retained by Mr. Martin for "treatment." If Dr. Russell shared privileged information with the other physicians who subsequently testified, the privilege should have attached to all of them. *People v. Wasker*, 353 Mich 447, 91 NW2d 866 (1958). It should also be noted that in McCormick, Evidence 213, 214, n 15, § 99 (hornbook series, 2d ed 1972), the author cites cases which indicate that the physician-patient privilege exists even though the physician is

employed by a third party—e.g., the state—or examines the patient as part of a commitment proceeding—if the purpose of the committal included treatment as well as diagnosis, as it apparently did in Mr. Martin's case. The argument that no privileged physician-patient relationship arose between Mr. Martin and each of the four doctors appears to lack merit in light of the facts established in this record.

Because each of these physicians clearly testified as to "information acquired in attending the patient, which was necessary to enable him to prescribe or act for the patient," the central question becomes whether termination proceedings are "civil" actions for the purposes of the application of the privilege created by ORS 44.040 (1) (d).

■ The physician-patient privilege is available in only those proceedings properly characterized as "civil" in nature. *State v. Betts,* 235 Or 127, 384 P2d 198, 7 ALR3d 1445 (1963). Because they are designed primarily to protect the interests of an individual—the child—rather than society as a whole, hearings initiated by the state to consider the termination of parental rights under ORS 419.525 cannot truly be characterized as "criminal." The Oregon Supreme Court has, however, ruled that they may be analogized with criminal cases in some respects because through them the state seeks to deprive an individual—the parent—of an important right. *State v. Turner,* 253 Or 235, 453 P2d 910 (1969); *State v. Jamison,* 251 Or 114, 444 P2d 15, 444 P2d 1005 (1968). Juvenile proceedings might, therefore, be termed "quasi-criminal" and thus beyond the coverage of ORS 44.040 (1) (d), but this would not represent an entirely satisfactory resolution of the issue. An attempt to remove the pro-

ceedings from the scope of the privilege might more appropriately be based on the terms of ORS ch 419 generally and ORS 419.474 (2)① specifically. These statutes would appear to warrant the conclusion that juvenile proceedings are, in fact, neither criminal nor civil but sui generis, and that they should be allowed to assume a form which best meets the unique purposes and needs of juvenile courts while at the same time affording the due process rights that have been held essential to juvenile proceedings in cases like *In Re Winship,* 397 US 358, 90 S Ct 1068, 25 L Ed 2d 368 (1970) ; *In Re Gault,* 387 US 1, 87 S Ct 1428, 18 L Ed 2d 527 (1967) ; *State v. Jamison,* supra.

The title, statement of statutory intent, and specific provisions of ORS ch 419 suggest that the legislature sought to create proceedings specially and uniquely suited to protect the needs of both children and the public. Further, the legislature has specifically provided that one of the things juvenile courts can and should consider when determining whether parental rights will be terminated is any "[e]motional illness, mental illness or mental deficiency of the parent of such duration as to render it impossible to care for the child for extended periods of time." ORS 419.523 (2)(a). Thus, it can be cogently argued that consideration of these provisions should lead to the conclusions that such proceedings are not "civil" ac-

---

① ORS 419.474 (2) provides:

"The provisions of ORS 419.472 to 419.587 shall be liberally construed to the end that a child coming within the jurisdiction of the court may receive such care, guidance and control, preferably in his own home, as will lead to the child's welfare and the best interests of the public, and that when a child is removed from the control of his parents the court may secure for him care that best meets the needs of the child."

tions for the purposes of ORS 44.040 (1)(d), and that the privilege should not be available to parents involved in such termination hearings where competent medical testimony bearing upon his or her mental illness and rehabilitative potential is not only the best evidence but perhaps the only evidence helpful to the court.

Balanced against this view, however, is the argument which can be made in support of permitting a psychiatrist-patient privilege (as opposed to a general physician-patient privilege) to be asserted in juvenile proceedings as well as all others. In McCormick the author states:

"* * * * *.

"Psychotherapists: On account of the special therapeutic need for assurance to the patient of protection against disclosures it is cogently argued (on the basis of a Circuit Court decision in Chicago) that even in states not having the physician-patient privilege generally, a privilege should be recognized, by statute or decision, for confidential disclosures to psychiatrists, qualified psychologists trained in the treatment of mental disorders, and (in the court's discretion) general practitioners consulted for diagnosis or treatment of mental disease. Note, Communications to a Psychotherapist, 47 Nw. U.L.Rev. 384, in Selected Writings on Evidence and Trial 254 (Fryer ed. 1957). See also, Taylor v. United States, 95 U.S.App.D.C. 373, 222 F.2d 398, 401 (1955) and see Slovenko, Psychiatry and a Second Look at the Medical Privilege, 6 Wayne L.Rev. 175 (1960). He writes (pp. 199, 201) 'A privilege of those receiving psychotherapy is necessary if the psychiatric profession is to fulfill its medical responsibility to its patients. . . . It is interesting to note that recently seven states (Ark., Calif., Ga., Ky.,

N.Y., Tenn., and Wash.), three of them not having a medical privilege (Cf. Ky.Rev.Stat. § 213.-200), have passed legislation granting to the certified or licensed psychologist *qua* psychologist an absolute privilege as in the lawyer-client relationship. There exists the anomaly in some of these states of giving the privilege to client-psychologist communications while denying it to a psychiatrist's patient.'

"* * * * *." McCormick, Evidence 213, n 9, § 99 (hornbook series, 2d ed 1972).

In this regard, it is relevant that in 1963 the Oregon Legislature added to ORS 44.040 (1) the following provision:

"(h) A licensed psychologist, as defined in ORS 675.010, shall not, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon, in the course of his professional employment."

This privilege is conspicuously framed in terms which do not limit its applicability to "civil" actions; it simply provides that the licensed psychologist "shall not * * * be examined * * *." As noted by McCormick, above, any interpretation of the patient-physician privilege which serves to deprive a psychiatrist's patient of the right to bar testimony in a proceeding where the patient of a licensed psychologist could successfully assert his own privilege results in the creation of an obvious anomaly. In terms of the functions and purposes of the privileges, any distinction between a licensed psychologist and a psychiatrist would seem to be a specious one.

■■ The way to decision is not clearly marked for us. It is probable that the legislature did not think of proceedings such as those created by ORS 419.525 when it provided for the patient-physician and licensed-

psychologist privileges. "* * * In such an instance we try to determine what the legislature would have done if they [sic] had considered the problem * * *." *State v. Tippie,* 269 Or 661, 665, 525 P2d 1315 (1974). The presence of the licensed-psychologist statute—which was added to ORS 44.040 (1) in 1963—indicates that we might expect a similar legislative concern for preserving patient-psychiatrist relationships. At this time, then, we are compelled to conclude that the testimony of the physicians/psychiatrists in the hearing below was protected by the privilege created by ORS 44.040 (1)(d) and was improperly admitted into evidence. (Although it should here be noted that if the legislature wishes to make an exception to such a privilege in juvenile proceedings or to make it clear that juvenile courts have authority to appoint psychiatrists or psychologists to examine parents involved in termination hearings, it has the authority to do so.)

In addition to finding that Mr. Martin was improperly denied the right to assert the physician-patient privilege in the hearing below, we have also concluded that there was "competent" evidence untainted by the improper admission of the privileged testimony sufficient to sustain termination; we thus affirm the decision of the court below and uphold its order terminating the parental rights of Mr. Martin.

In his written opinion, the judge below indicated that his decision was supported by two distinct sources of evidence: (1) his judicial knowledge of Mr. Martin's prior commitments together with unprivileged expert testimony concerning the chronic nature of schizophrenia, and (2) the testimony of the physicians which we have here held privileged.

■ Although the judicial knowledge of the prior commitments (the most recent of which had been over two years prior to the hearing) together with the "general or abstract" testimony of the experts testifying might not—by themselves—have constituted sufficient cause for terminating Mr. Martin's parental rights, the record we have reviewed discloses that there is additional unprivileged testimony which provides supplementary facts adequate to justify termination of parental rights.

Mr. Martin's testimony on direct examination included the following question and answer:

"Q And for some period of time you have been ill, is that right?
"A Yes."

Subsequently, the appointed counsel of the children involved cross-examined Mr. Martin, and during the course of that cross-examination—in a question clearly within the scope of the direct which included the question and response noted above—he was asked about any recent acute attacks or episodes of irregular behavior. Mr. Martin's response—substantiated by the testimony of additional lay witnesses—was that he had had his last acute attack in October of 1973—within three or four months of the hearing. No objection by Mr. Martin's attorney was made, or legitimately could have been made, to this specific inquiry.

We think that this additional testimony, when added to the court's judicial notice of the prior commitments and consideration of unprivileged expert testimony was a sufficient basis for the termination order.

Affirmed.