Argued September 20, remanded with instructions October 28, reconsideration denied by opinion December 16, 1974 (See 19 Or App 835, 528 P2d 1382), petition for review denied February 11, 1975

IN THE MATTER OF EZRA AND HADASSAH WADE, MINOR CHILDREN.

STATE EX REL JUVENILE DEPARTMENT OF MULTNOMAH COUNTY, *Respondent, v.* (No. 38,197) WADE ET UX, *Appellants,* WADE ET AL, *Appellants.*

527 P2d 753

*B. B. Bouneff,* Portland, argued the cause for appellants Ralph Wade and Claudia Wade. With him on the brief were Bouneff, Muller & Marshall, Portland.

*David Lowell Slader,* Portland, argued the cause and filed the briefs for appellants Ezra and Hadassah Wade.

*Betsy Welch,* Senior Deputy District Attorney, Portland, argued the cause for respondent. With her

on the brief was Harl Haas, District Attorney, Portland.

*Richard L. North* and *Paul Piersma,* St. Louis University School of Law, St. Louis, Missouri, filed a brief amicus curiae on behalf of National Juvenile Law Center.

Before LANGTRY, Presiding Judge, and FOLEY and FORT, Judges.

LANGTRY, P. J.

After a hearing held in accordance with ORS 419.-525, the circuit court determined that Ralph and Claudia Wade were "unfit by reason of conditions which are and which will continue to be seriously detrimental * * *" to their children, Ezra and Hadassah, and terminated their parental rights. The court based this action on its finding that although the Wades were well-meaning and had maintained contact with the children throughout almost four years of foster care, the "unfortunate condition of mental illness of the mother and mental deficiency of the father" made them "physically, mentally, emotionally, and psychologically" unable to function as parents.

As appellants, the Wades raise six assignments of error, each of which will be discussed below. The children, represented by their own counsel, also appear here as appellants on the single issue of their right to independent legal representation at the termination hearing.[1]

---

[1] The standing of the Child Advocacy Project of the Metropolitan Public Defender to appear on behalf of the children in this appeal was challenged by the state at the time briefs were

## I

The initial assignment challenges the circuit court's refusal to appoint "independent" counsel to act on behalf of the children. As a preliminary matter counsel for the Wades moved for an appointment of children's counsel, pointing out that his professional obligation to the parents required him to argue in favor of the maintenance of the parent-child relationship irrespective of any conflicting interests of the children, and suggesting that the district attorney—the representative of the state charged with presenting the case against the parents, and proving facts sufficient to satisfy the law—was likewise incapable of providing the effective representation due the children as equal parties to the action. *State v. Mc-Master,* 259 Or 291, 296, 486 P2d 567 (1971).

While conceding that children whose circumstances are the subject of deliberations in juvenile court have the right to counsel, and that where a specific showing of need is made, a circuit court has the authority and responsibility to appoint independent counsel; the deputy district attorney opposed such an appointment in this case on the ground that the interests of the Wade children were synonymous with those of the state and would thus be adequately protected by the state's advocate. Noting its respect for the ability and intentions of the deputy district attorney, the court denied the motion, agreeing that the

submitted. We find that the Children's Services Division has the authority and duty pursuant to ORS 419.519 (2) and 419.521 (1)(e) to provide children in its custody with legal representation and thus was within its authority in contracting with the Child Advocacy Project for such representation in termination-of-parental-right proceedings and in retaining counsel for this appeal. The trial court may yet accept such counsel to represent the children.

state's counsel would provide adequate and effective representation for the children.

■ That children have an interest in the outcome of termination actions which is worthy of all the protection afforded the interests of their parents is apparent. The basic human right to maintain and enjoy the relationship which normally exists between the parents and the children is held no less by the children than by the parents. When the United States Supreme Court ruled this right to be subject to constitutional protection—*Griswold v. Connecticut,* 381 US 479, 85 S Ct 1678, 14 L Ed 2d 510 (1965); *May v. Anderson,* 345 US 528, 73 S Ct 840, 97 L Ed 1221 (1953); *Prince v. Massachusetts,* 321 US 158, 64 S Ct 438, 88 L Ed 645 (1944); *Skinner v. Oklahoma,* 316 US 535, 62 S Ct 1110, 86 L Ed 1655 (1942); *Meyer v. Nebraska,* 262 US 390, 43 S Ct 625, 67 L Ed 1042, 29 ALR 1446 (1923)— it necessarily guaranteed that neither parents nor children shall be deprived of it without due process. *In Re Winship,* 397 US 358, 90 S Ct 1068, 25 L Ed 2d 368 (1970); *Tinker v. Des Moines School Dist.,* 393 US 503, 89 S Ct 733, 21 L Ed 2d 731 (1969); *In Re Gault,* 387 US 1, 87 S Ct 1428, 18 L Ed 2d 527 (1967); *Haley v. Ohio,* 332 US 596, 68 S Ct 302, 92 L Ed 224 (1948).

When the Oregon Supreme Court recognized the importance of legal representation in termination-of-parental-right hearings, it specifically required that such representation be provided *both* parents and children:

"The permanent termination of parental rights is one of the most drastic actions the state can take against its inhabitants. * * * Counsel in juvenile court must be made available for parents and children alike when the relationship of parent and

child is threatened by the state * * *." *State v. Jamison*, 251 Or 114, 117, 444 P2d 15, 444 P2d 1005 (1968).

The clear directive embodied in *Jamison* is not determinative, however, of the issue raised here; the language noted above does not unequivocally require that parent and child be represented by *separate* counsel. Neither is there any Oregon statute which makes such representation a requirement. ORS 419.494 provides only that "[i]n any proceeding the court may appoint some suitable person to appear in behalf of the child," and would thus appear to require even less than *Jamison*. While ORS 419.498 (2) provides for the mandatory appointment of counsel "[i]f the child, his parent, or guardian *requests* an attorney but is without sufficient financial means * * *" (emphasis supplied), and ORS 419.563 (1) makes provision for both the nondiscretionary appointment of counsel on appeal upon the request of an indigent child and appointment by the court upon its own motion, neither is particularly helpful, even accepting the argument that the absence of a request cannot constitute a waiver where, as here, the failure to request is the result of ignorance or immaturity. These statutes can at best be relied upon to require the appointment of *some* counsel in all cases; they do not necessarily make independent counsel a requisite in any case.

The issue raised here is, therefore, whether due process is satisfied when a child involuntarily entangled in a termination proceeding is obligated to accept "joint" legal representation by either of the two other necessary parties—the parents or the state.

■■ Because the right to counsel is the right to "effective" legal representation—*Powell v. Alabama*,

287 US 45, 53 S Ct 55, 77 L Ed 158, 84 ALR 527 (1932)—the real issue here is whether either the district attorney or the counsel for the parents is capable of providing the children with the "effective" representation to which they have a constitutional claim.

It may be argued that if parents are truly "unfit"—i.e., the juvenile court ultimately decides that such unfitness has been established—then the district attorney acts as the representative of the children as well as the state in his pursuit of termination. If, on the other hand, the ultimate decision of the court is that the state has failed to carry its burden in establishing parental unfitness, one might conclude that the best interests of the children will have been promoted throughout by counsel for the parents. The children are thus "awarded" as "clients" to whichever party prevails at the hearing. If, however, children involved in these proceedings have interests which are unique to them, that is, shared with neither the state nor their parents, this analysis becomes unacceptable. One commentator has pointed out:

"* * * Current noncriminal juvenile court practices allow the parents and the child welfare agency to be represented by counsel. Each attorney presents his arguments from the viewpoint of his client, with the child caught in the middle. The effect of this type of proceeding is to render the child a chattle [sic], and determinations of his future are made as would decisions about possession of an automobile. While each side argues in terms of the 'best interests of the child,' beneath this altruistic veneer lies the desire to win the case for the client—who is not the child." Grumet, *Victims of the Battered Child Syndrome,* 4 Family L Q 296, 314 (1970).

Where the state initiates a proceeding to term-

inate parental rights *because it has determined to its own satisfaction* that parents are "unfit," and where the issue of "fitness" is to be adjudicated as a matter of fact, the potential for conflict between the interests of the children who are the real subjects of the action and of *both* the parents and the state seems manifest. In order to conclude, prior to any adjudication, that either the state or the parents will or can adequately represent the children, one must be willing to argue that in every case they have no interests which are not shared with either of two necessarily adversary parties.

The potential inability of a parent's advocate to provide a child involved with representation which even approximates "effective counsel" is not difficult to point out. A termination proceeding places into issue an individual's "fitness" as a parent; an attorney retained or appointed to represent that parent is bound by professional ethics to put forth his best efforts to refute the charge of unfitness and to preserve for his client the parent-child relationship threatened by the state. This duty is not modified or diminished in any way by any obligation to protect the "best interests" of the child involved. (Oregon State Bar, Code of Professional Responsibility, Canon 5 (1974).)

Although the conflict between the interests of the state and those of the child are not as apparent as the child-parent conflict described above, the fact that in most cases the termination of parental rights makes the state the recipient of the child's custody (ORS 419.527 (1)(a)), thereby enabling it to consent to an adoption (ORS 109.316 (1)(b)), indicates that the potential may not be insubstantial. When termina-

tions are viewed as a means of facilitating adoptions, one becomes aware that they will always promote the interests of the state regardless of the peculiar interests of any single child; terminations aid the state in meeting the demand for "adoptable" children while also relieving it from financial costs of long-term foster care, homemaker services, and other welfare or public services. This exclusive interest of the state is clearly a source of potential conflict which may prevent the district attorney—whose client in these proceedings is primarily the state—from providing a child with the effective representation of which independent counsel would be capable.

We find that in *all* termination proceedings there are potential conflicts between the interests of the children and those of both the state and the parents, and thus hold that independent counsel must represent the children in all termination proceedings. We note that this ruling is in conformity with the Uniform Juvenile Court Act adopted by the American Bar Association in 1968 which provides in Rule 26 (a) for separate counsel in juvenile proceedings if the interests of two or more parties conflict.

## II

ORS 419.523 provides in relevant part:

"\* \* \* \* \*.

"(2) The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable in the forseeable [sic] future due to conduct or conditions not likely to change. In de-

termining such conduct and conditions, the court shall consider but is not limited to the following:

"(a) Emotional illness, mental illness or mental deficiency of the parent of such duration as to render it impossible to care for the child for extended periods of time.

"* * * * *."

As the second assignment of error the Wades challenge this statute as unconstitutionally vague and indefinite, specifically arguing that it "fails to provide substantive standards and procedural safeguards for the determination of mental illness or mental deficiency * * *."

In 1971 a statute, outlining the grounds for termination of parental rights in terms even more broad than those presently incorporated into ORS 419.523, was also subjected to constitutional attack. At that time ORS 419.523 read in pertinent part:

"* * * * *.

"(2) The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents:

"(a) Are unfit by reason of conduct or condition seriously detrimental to the child * * *

"* * * * *."

The Supreme Court in *State v. McMaster,* 259 Or 291, 486 P2d 567 (1971), concluded that this language was sufficiently specific to meet the challenge of "void for vagueness."

If anything, the provisions added to the statute in 1973 have served to make it more rather than less immune to constitutional challenge, as they have clarified to some degree the standard against which a parent's "conduct and conditions" can be uniformly judged.

## III

■ The third assignment raised here is that the testimony of Dr. Carl V. Morrison—a psychiatrist retained by the Children's Services Division to evaluate the mental condition of the Wades—should have been excluded from the hearing because it was obtained in violation of due process of law, i.e., Dr. Morrison acquired the information upon which he based his testimony through "trickery and fraud" worked upon the Wades who were not aware of the purpose of his interview with them.

Review of the evidence contained in the record indicates that this assignment lacks merit: (1) Three to four weeks prior to Dr. Morrison's interview with the Wades in March of 1974 the district attorney met with their appointed counsel to discuss with him the need for and purpose of the interview. Appointed counsel actively participated in arranging the interview. (2) Caseworker John Lawrence testified that everytime he called Mrs. Wade he would "indicate to her that [he] was asking for information for the Court * * * [f]or a hearing, termination of their parental rights." (3) Claudia Wade testified as a witness that she understood the purpose of the termination hearing. As noted by the Wades, "[d]ue process is an equitable concept which is intended to provide fair standards and procedures * * *." There is no evidence in this record which suggests that the state at any time proceeded in other than a straightforward and "fair" manner.

## IV

The Wades next challenge the admission of Dr. Morrison's testimony on the ground that it was obtained from the Wades in violation of the privilege

against "self-incrimination" embodied in the Fifth Amendment to the U.S. Constitution as well as Art I, § 12 of the Oregon Constitution. The Wades specifically argue that their self-incrimination privilege was violated because Dr. Morrison's psychiatric examinations "were conducted without appropriate *Miranda* warnings * * *."

Although the Oregon Supreme Court has held that a trial court is without authority to require a defendant during a pretrial mental examination to answer questions concerning conduct related to an *offense charged* and cannot order defendant's counsel not to advise his client to refuse to answer questions on the ground that they might tend to incriminate him (*Shepard v. Bowe,* 250 Or 288, 442 P2d 238 (1968)), and although this court has ruled that before a *criminal* defendant can be examined by a psychiatrist acting as an agent of the state he or she must be specifically warned that anything said can be used in a *criminal* proceeding (*State v. Corbin,* 15 Or App 536, 516 P2d 1314 (1973), Sup Ct *review denied* (1974)), neither case is relevant here where Dr. Morrison interviewed the Wades in order to form a professional opinion as to their "fitness" as parents. Nothing said by Mr. and Mrs. Wade is being used against them in a criminal proceeding to deprive them of their liberty. The interdiction of the Fifth Amendment operates only where a person is asked to "incriminate himself," meaning to give testimony which might possibly expose him to criminal liability. *Kastigar v. United States;* 406 US 441, 92 S Ct 1653, 32 L Ed 2d 212 (1972) ; *Ullmann v. United States,* 350 US 422, 76 S Ct 497, 100 L Ed 511, 53 ALR2d 1008 (1956). The parameters of the privilege have traditionally protested from disclosure only testimonial statements

which tend to expose an individual to criminal liability. The Wades here propose, it appears, that the privilege be extended to encompass all statements which may be used to deprive one of a right as significant as that threatened in termination proceedings.

The Wades cite no cases in support of this theory; their reference to *In Re Gault,* supra, is not helpful, for in that case the Supreme Court's extension of the privilege to juveniles involved in adjudicatory delinquency proceedings appears to have been founded upon its conclusion that juvenile incarceration is essentially the same as criminal penalty:

> "* * * [J]uvenile proceedings to determine 'delinquency,' which may lead to commitment to a state institution, must be regarded as 'criminal' for purposes of the privilege against self-incrimination. To hold otherwise would be to disregard substance because of the feeble enticement of the 'civil' label-of-convenience which has been attached to juvenile proceedings. * * * [O]ur Constitution guarantees that no person shall be 'compelled' to be a witness against himself when he is threatened with a deprivation of his liberty. * * *." 387 US at 49-50.

Because the termination of parental rights is an action ostensibly designed to promote the best interests of children rather than to penalize parents, we are unwilling to equate such an act with the deprivation of personal liberty which results from a criminal conviction. No "self-incrimination" privilege was, therefore, available to the Wades with regard to the matters touched upon by Dr. Morrison during his interview with them.

## V

■ This assignment challenges the testimony of Dr. Morrison on the basis that the testimony was im-

properly admitted over an objection founded on the physician-patient privilege. ORS 44.040 (1)(d).

Dr. Morrison, a physician specializing in psychiatry and child psychiatry, interviewed the entire Wade family in April of 1973, and Mr. and Mrs. Wade again in March of 1974. Called to the stand by the district attorney, the doctor first noted that these interviews had been requested by the Children's Services Division, and then responded to questions concerning his professional relationship with the Wades:

"A * * * [The interview] was for the purpose of determining what was the best plan and care for the children. It was further my understanding that the both of the parents have their own physician and that I in no way was to be a personal physician. My evaluation of the parents was solely for the purpose of determining, making a diagnosis of their condition and their status and their possible ability to care for these children.

"Q Dr. Morrison, you have stated that each of the parents had their own physician. Do you know who either of the parents' physicians are?

"A Yes, I personally know who the physician of Mrs. Wade is. I have read his reports, I have also spoken with him personally concerning her. And it was the understanding that the personal physician did not wish to testify because of his patient relationship and it was my understanding that the reason, the only reason that I was seeing this couple was to make the evaluation as I have just stated. Never to even diagnose nor to advise these people in any way as a physician, personal physician."

Before Dr. Morrison related any evidence regarding the Wades' mental conditions, their counsel objected to any such testimony on the ground that it was matter

protected by the statutory physician-patient privilege. The court overruled this objection, finding that

> "* * * rules of evidence will permit Dr. Morrison's testimony regarding his findings when he examined the parents because based upon the little testimony that was adduced from Dr. Morrison last week it was my understanding, and I think it's still true, that he was in a non-treating status. However, any information that Dr. Morrison obtained from Dr. Duncan, the treating physician of Mrs. Wade, I find does fall within the privilege and no testimony from that source will be permitted unless the State is able to show that Mrs. Wade authorized the release of such information to Dr. Morrison."

This ruling is consistent with our recent decision in *State ex rel Juv. Dept. v. Martin,* 19 Or App 28, 526 P2d 647 (1974). While we there concluded that testimony offered by a psychiatrist in a termination proceeding may be barred by the physician-patient privilege where he has "prescribed or acted for" the parent alleged to be "unfit," or relates information communicated from one who has so acted, the rule established there does not work to protect the testimony of any psychiatrist with whom the parent does not have such relationship and who testifies only as to his own conclusions based upon his own professional judgments. Thus, the admission of Dr. Morrison's subsequent testimony was proper if, in fact, he never assumed to "prescribe or act for" the Wades and avoided relying in any way upon information obtained from their personal physician.

Dr. Morrison's explicit denial that he ever acted as the Wades' treating physician is not contradicted by any evidence in the record; it is, in fact, buttressed by his claim—elicited on cross-examination—that his

testimony was based solely on his own professional "determinations and assumptions" formulated as a result of his interviews with the Wades.

## VI

■ The final assignment of error is that there was insufficient evidence in this case to justify the termination of parental rights. Where termination is sought to be based on the mental or emotional illness or deficiency of a parent, the state has the burden of proving by a preponderance of the evidence

"* * * (1) that the parent is presently unable to supply physical and emotional care for the child (if necessary, with the aid of social agencies available), and (2) that this condition will probably continue for time enough to render improbable successful integration of the child into a family if the parent's rights are not terminated * * *." *State v. Blum,* 1 Or App 409, 417, 463 P2d 367 (1970).

Dr. Morrison examined both Mr. and Mrs. Wade and testified concerning their mental and emotional "conditions." That testimony indicates Claudia Wade suffers from incurable paranoid schizophrenia and although treatment has reduced the level of her anxiety so that she can

"* * * operate on a minimal basis of caring for herself and living a fairly normal existence * * *

"* * * * *

"* * * if she were to be given the care and responsibility of her children that this would be anxiety producing and this would be more than she could handle and would worsen the condition."

The record shows that Mrs. Wade's illness includes a systemized set of delusions by which she is able to maintain that as a child she was transported to Earth from the planet La Moria in the galaxy of Andromeda,

and has since the age of 13 been regularly correspond-
ing, by way of a messenger, with her family remaining
there. Mrs. Wade also believes that her children will
be able to receive messages from La Moria when they
reach adolescence in spite of the fact that they are
"part Earthling." Dr. Morrison also testified that Mrs.
Wade's condition would not change in the foreseeable
future and that there were no social or mental health
services available "that would help her beyond what
she has already received." Ralph Wade apparently
has an intelligence level which is within the "borderline
range," and while he can do a reasonable job of taking
care of himself he could not be expected "to cope with
the problems of child rearing." Dr. Morrison also testi-
fied that the children are normal and active, and that,
in effect, the necessity of their adjusting to, accepting,
or compensating for the delusional peculiarities of
their mother if they were to live with her would have
a devastating effect on their future well-being.

Several witnesses testified that when asked about
her plans for the future care of her children Mrs. Wade
consistently responded by stating that no plans were
necessary because of the imminence of the "millen-
nium." The parents suggest that this disregard for the
future care of the children cannot be considered as
evidence supporting a decision to terminate because it
is part of Mrs. Wade's religious beliefs as a Jehovah's
Witness. As a witness for the state, Mr. Forrest Far-
mer—an "overseer" of the Witness faith—testified that
the parental obligations of Witnesses include the re-
sponsibility "to educate their children, to materially
care for their children and to comfort them and take
care of them in time of need." Mr. Farmer also indi-
cated that these parental duties will remain the same
after the commencement of the millennium. It is evi-

dent that Mrs. Wade's own inability to accept responsibility for her children, rather than the tenets of any religious faith, prevents her from planning for either the physical or emotional care of her children.

Caseworker Janet Reed's testimony reveals two facts of significance. The first is that at one time Mr. Wade acknowledged his and his wife's inability to care for their children because of Claudia's "illness." The second is that Mrs. Wade's inability to comprehend the needs of her children is so substantial that during 1971 she suggested that they be "given" to friends of hers who had had their own children removed from their custody by the juvenile court.

The children—now aged seven and nine—have been in foster care for close to four years. The preponderance of the evidence introduced below indicates that there is no prospect that they can reasonably expect to live with their parents in the foreseeable future. Balancing the interests of these parents against the best interests of the children—which are of *primary* importance in these proceedings—it seems evident that the mental illness of the mother and the mental deficiency of the father together constitute seriously detrimental conditions sufficient to cause the termination of parental rights. As this court noted in *Blum*:

> "It is important that the child have a sense of belonging to a family. This is one of the things we look for after we say that our prime consideration is the best interests of the child. It is not in the best interests of the child to keep him forever in a limbo—a limbo that is terminated, if at all, when on some uncertain date his mentally ill mother recovers and gives him normal mother's care * * *."
> 1 Or App at 416.

Thus, we conclude that, although the state succeeded in establishing by a preponderance of the evidence introduced below that termination would be necessary, the motion for independent counsel for the children should have been allowed. The case is remanded for the appointment of counsel who may offer further evidence on behalf of the children, or, upon consideration of the record already made, waive production of further evidence. The trial court may then proceed to judgment, consistent with this opinion.

Remanded with instructions.