Argued May 21, affirmed June 17, reconsideration denied July 24,
petition for review denied September 4, 1974

IN THE MATTER OF McMASTER, LINDA, A CHILD.

STATE EX REL JUVENILE DEPARTMENT OF
MULTNOMAH COUNTY, *Respondent, v.*
McMASTER ET UX (No. 28,299-A),
*Appellants.*
523 P2d 604

[ 1 ]

*Deane Sterndale Bennett,* Portland, argued the cause and filed the brief for appellants.

*Betsy Welch,* Senior Deputy District Attorney, Portland, argued the cause for respondent. With her on the brief was Harl Haas, District Attorney, Portland.

Before SCHWAB, Chief Judge, and LANGTRY and THORNTON, Judges.

LANGTRY, J.

On October 31, 1973 the juvenile court terminated parental rights to the seven-year-old child Linda, after a hearing in August 1973. This is the parents' appeal from that judgment. The child had been made a ward of the court in June 1972, after hearing and based upon a petition dated December 8, 1972. The June 1972 hearing and another in January 1973 had resulted in continuing foster care for the child, and the court set up detailed and specific warnings in the order after each hearing as to the steps the parents must take to avoid termination. The only question on appeal is whether there was sufficient evidence presented at the August 1973 hearing upon which to terminate the parental rights.

The same parents had previously had their parental rights terminated with reference to an older sister of Linda named Anna. That decision was affirmed in this court, *State v. McMaster,* 4 Or App 112, 476 P2d 814 (1970), and reversed in the Oregon Supreme Court,

259 Or 291, 486 P2d 567 (1971). In the latter case the Supreme Court said:

"* * * We are only deciding that the Mc-Masters' parental rights cannot be terminated *at this time* * * *.

"We are of the opinion that the state of the McMaster family is duplicated in hundred of thousands of American families, — transiency and incapacity, poverty and instability. * * * When the legislature used the phrase, 'seriously detrimental to the child,' we believe that they had in mind a more serious and uncommon detriment than that caused by the conduct of parents such as the McMasters. The best interests of the child are paramount; however, the courts cannot sever the Mc-Masters' parental rights when many thousands of children are being raised under basically the same circumstances as this child. The legislature had in mind conduct substantially departing from the norm * * *." (Emphasis supplied.) 259 Or at 303-04.[1]

---

[1] State v. McMaster, 259 Or 291, 486 P2d 567 (1971), decided ORS 419.523 was not unconstitutionally vague. The second issue in the case was the one from which our text quotation was taken, and the one upon which reversal was based.

When *McMaster* was decided by the Supreme Court in June 1971, ORS 419.523 provided:

"(1) The parental rights of the parents of a child within the jurisdiction of the juvenile court as provided in subsection (1) of ORS 419.476 may be terminated as provided in this section and ORS 419.525. The rights of one parent may be terminated without affecting the rights of the other parent.

"(2) The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents:

"(a) Are unfit by reason of conduct or condition seriously detrimental to the child; or

"(b) Have wilfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for the child for one year. In determining whether the parent has wilfully deserted or neglected without just and sufficient

After the previous decision was reversed, the Mc-Masters gave their consent to Anna's adoption by the foster parents who had raised her.

It was noted in our previous opinion that a younger child, Linda, was in the McMaster home. This

cause to provide proper care and maintenance for the child, the court may disregard incidental visitations, communications and contributions."

Perhaps because of the rejected constitutional challenge in the first *McMaster* case, this statute was amended by Oregon Laws 1973, ch 804, § 1, to provide:

"(1) The parental rights of the parents of a child within the jurisdiction of the juvenile court as provided in subsection (1) of ORS 419.476 may be terminated as provided in this section and ORS 419.525. The rights of one parent may be terminated without affecting the rights of the other parent.

"(2) The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable in the forseeable [sic] future due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(a) Emotional illness, mental illness or mental deficiency of the parent of such duration as to render it impossible to care for the child for extended periods of time.

"(b) Conduct toward any child of an} abusive, cruel or sexual nature.

"(c) Addictive use of intoxicating liquors or narcotic or dangerous drugs.

"(d) Physical neglect of the child.

"(e) Lack of effort of the parent to adjust his circumstances, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"(3) The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents have failed or neglected without

child was made the subject of several petitions filed in the juvenile court, the last ones of which culminated in the case at bar. The evidence in the record indicates that the public agencies which worked with the Mc-Masters and their child Linda expended unbelievable amounts of professional time, care, money[2] and

reasonable and lawful cause to provide for the basic physical and psychological needs of the child for one year prior to the filing of a petition. In determining such failure or neglect, the court shall consider but is not limited to one or more of the following:

"(a) Failure to provide care or pay a reasonable portion of substitute physical care and maintenance if custody is lodged with others.

"(b) Failure to maintain regular visitation or other contact with the child which was designed and implemented in a plan to reunite the child with the parent.

"(c) Failure to contact or communicate with the child or with the custodian of the child. In making this determination, the court may disregard incidental visitations, communications or contributions.

"* * * * *." ORS 419.523.

The amendments appear to be largely a specific inclusion in the statute of reasons for termination that were reasonable under the statute before it was amended. The specifics of the 1973 amendment leave the thought that the legislature was fitting them to this case. Whether the amended statute or the previous one applies on this appeal is immaterial, because our conclusion would be the same under either version. The detailed requirements of the June 1972 and January 1973 orders, and the detailed findings of the final order, too long to set out herein, fit neatly into the amended statute, ORS 419.523 (2) (a), (c), (d) and (e).

A new petition was filed with the court on May 24, 1973, which brought allegations against the parents up to date. The substance of ORS 419.525 (3) was brought into play by the previous orders of the court and the allegations of the new petition. The evidence at the August 1973 hearing and the detailed findings made on October 31, 1973, based on the May 1973 petition, fit neatly into the present provisions of ORS 419.523 (3) (a), (b) and (c).

[2] For example, allowance of public money in the trial court alone for the benefit of the parents and child based upon orders in the file shows the following: attorneys, $3,245; court reporters for transcripts, $1,555.35; a psychiatrist, $55.

guidance in attempting to help the McMaster parents accept and meet adequate responsibility for rearing their children. The circuit court's findings of fact supported by the record made in this case show that the following have attempted to aid the McMasters in the fulfillment of their responsibilities: eight named hospitals in Portland, two in The Dalles, Dammasch State Hospital and the U.S. Veterans' Administration Hospital; 37 named public and private welfare agencies have extended their services to the parents. Included therewith were almost constant welfare grants in one form or another; 32 named physicians; two named probation officers; two named ministers; and five named hospital counselors. The parents also borrowed $5 for bus fare from the trial judge at one of the hearings.

Dr. Carl V. Morrison, child psychiatrist, saw Linda on several occasions. The history he testified to concerning the McMaster parents contained the following:

"* * * Edward comes from a family where there's mental illness. He comes from a family where there's alcoholism, which was reflected as a child all during his growth period.

"He did not have the support nor the consistent help and training that a child does need. In other words, he was not able to complete his emotional growth.

"We found that Nadine had similarly grown up in a series of foster homes. She had not been permitted to be adopted by a family that did wish to adopt her; yet her normal — her regular family did not visit or express an interest in her. This left her in limbo, and it's my professional opinion that this did contribute to her present insecurity."

Mrs. Janet Reid, Children's Services Division caseworker in Multnomah County who is assigned the most

troubled child welfare cases in that department, testified:

> "* * * [T]hey have received more services than any others have of my other clients, and their problems are more severe than my other clients."

She also testified that she spent from one-third to one-half of her time working with this one family while Linda was in her parents' home. A welfare caseworker from The Dalles testified that, when the parents left Portland and resided for a time in Wasco County after Linda had been removed from them, she spent more time with the McMasters than with any other of her clients. Dr. Morrison testified:

> "* * * The thing that is amazing to me is the tenacity and the long suffering work that has been done by this agency; namely, the Children's Services.
>
> "In my professional experience, I've never seen anybody proceed with more courage, for going at it again, giving full credence to the philosophy, working and laboring with parents to the fullest extent of their capacity."

The professionals who worked with the case testified that when concentrated work and resources are brought to bear on a case as was done here progress usually results. But with the McMasters, as Mrs. Reid put it,

> "They are just absolutely the same. Nothing has changed.
>
> "* * * * *
>
> "* * * Most of the time they are not even able to take care of themselves.
>
> "* * * * *
>
> "* * * These people go off and leave a dog shut up in the house for three days with no food and

water and they can't take care of a dog, let alone
a kid."

Much more could be said with reference to the opinions
of the professionals who worked with the family. Suf-
fice it to say, they are unanimous in their belief that
there is no indication that the McMasters will ever
improve except for a few weeks in advance of a hearing
before the court when they seem to be able to pull
themselves together in a sporadic effort. This record
is not like that of thousands of other parents or even
hundreds or dozens of other parents who neglect their
children. It is worse.

The record is replete with specific instances of
inadequacy. It is replete with descriptions of drunken-
ness on the part of the husband, fighting between the
husband and wife (the last instance being in May 1973,
two months before the last hearing, when the husband
sought out his wife from whom he had been separated,
and while drunk had beaten her), inability of the wife
to keep anything except a filthy house, utter failure of
the husband to get and keep a job, taking welfare
money to make a trip or buy liquor, other misuse of
welfare money to the point where the welfare depart-
ment would allow assistance only by way of paying
for groceries that were actually used, evictions from
various homes and apartments, etc. On one occasion
they received $1,000 in a lump sum social security pay-
ment when a relative died. In two months they "blew
it all" and still owed "$142 to a veterinarian for care
on a stray cat they took in." Within a month after that
they were evicted from their home, had their lights
turned off, and had no food. On one occasion the child
Linda had her leg placed in a cast by a physician and
the father cut the cast off — for what reason is unclear.

The chaotic life of the McMasters was such that in March 1972 Linda was removed from the home and placed with a foster family. Arrangements were made for the parents to visit with her at a Child Management facility. Often they failed to appear for these visitations and on at least one occasion they tried to cash in the bus tickets that were given them to go to the facility.

The child was precocious and had an understanding far beyond what might be expected of a child of her years. She simply changed her last name of her own volition. The parents' visitations with her were upsetting and finally were terminated. Dr. Morrison testified:

"She could recall that her father had been frequently drunk. She recalled there had been fights between both parents and sometimes there was no food. She herself expressed the feeling that she would have to take care of her parents if she returned.

"* * * * * *

"* * * It can be destructive to the point where I feel that there is almost a hundred percent chance that if these contacts are to be continued, that these children will become either delinquent or emotionally sick themselves to a serious extent, or they will be both. [Dr. Morrison had previously been in contact with Anna.]

"* * * * * *

"It's my professional opinion if we do not set up situations so this child can have a very good, stable ongoing situation from now on, she will surely become a considerable difficulty as well as her parents have been.

"* * * * * *

"I think the girl could very well become delinquent. I think she could formulate the policy of

running away to solve her problems. I think she would be seriously hypochondriacal and become depressed and suicidal."

The attorney for the parents sought and received permission of the court to have the child seen by Dr. Herman A. Dickel, a qualified psychiatrist of the parents' attorney's choosing, without Dr. Dickel's having any access to prior information about the parents. Dr. Dickel's report was received in evidence. In it he remarked twice about the child's apparent necessity, during his interview with her, to run out of his office to see if her foster mother was still waiting for her. In his report he stated that Linda said she loved her parents but

"* * * [w]hen questioned on several instances as to why she wanted to be adopted, she very carefully stated and essentially this way each time 'because my adopted mother [Linda on her own had decided her foster mother was her adopted mother] teaches me how to behave and if I didn't have her I wouldn't behave'.

"Her attachment to, her reliance upon the adopted mother is apparently because she herself senses the greater ability to depend upon this adopted mother, something she can't do with her own parents.

"* * * She has been buffeted around back and forth to the point where there is no present stable behavior pattern, yet the girl still has the semblance of a stable pattern deep within her. I think she is highly trainable, I think excellent results can be expected of this child in the future, but I believe that it will require the consistent and persistent efforts of a stable home to do so. I think we can believe this child when she says, 'My adopted mother teaches me to behave — if she didn't I wouldn't behave'."

In their testimony the parents denied many if

not most of the things that had been said about them, were evasive about others and had excuses for still others. They blamed most of their difficulties on the agencies that had helped them most. There were glaring inconsistencies in their explanations and excuses. The overwhelming evidence is that they can never be expected to give minimal decent care to any child, because they are incapable of doing so. In the first *McMaster* case the Supreme Court said, "* * * The best interests of the child are paramount * * *." The evidence is that the best interests of this child will be served not at all if she is allowed to remain in the limbo where she would be if the McMasters still had a hold upon her. The record that has now been made is one of "conduct [of the parents] substantially departing from the norm" and one which the legislature must have contemplated as cause to terminate parental rights.

Affirmed.