Argued February 25, reversed and remanded March 31, 1975

In the Matter of Phillip Robert Zinzer, a child.

STATE ex rel JUVENILE DEPARTMENT OF
CLACKAMAS COUNTY, *Appellant, v.*
ZINZER et ux (No. 7483), *Respondents.*

In the Matter of Michael Henry Paulson, a child.

STATE ex rel JUVENILE DEPARTMENT OF
CLACKAMAS COUNTY, *Appellant, v.*
ZINZER (No. 7474), *Respondent.*

533 P2d 355

*Betsy Welch,* Deputy District Attorney, Oregon City, argued the cause and filed the brief for appellant.

*William B. Reisbick,* Milwaukie, argued the cause and filed the brief for respondents.

Before SCHWAB, Chief Judge, and FOLEY and LEE, Judges.

FOLEY, J.

On May 22, 1974, petitions were filed in the Circuit Court of Clackamas County, Juvenile Department, seeking termination of the parental rights of Eugene and Jeannie Zinzer to the child Phillip Zinzer and of Jeannie Zinzer to the child Michael Paulson. After hearing, the petitions were dismissed. The Juvenile Department of Clackamas County appeals. ORS 419.561.

Our review of these cases is conducted in the same manner as an appeal in an equity suit, ORS 419.561(4), which means a de novo review upon the record, ORS 19.125(3).

The primary statute regarding the grounds for termination of parental rights is ORS 419.523, which provides in pertinent part:

"(1) The parental rights of the parents of a child within the jurisdiction of the juvenile court

\* \* \* may be terminated as provided in this section \* \* \*.

"(2) The rights of the parent or parents may be terminated \* \* \* if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable in the forseeable [sic] future due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(a) Emotional illness, mental illness or mental deficiency of the parent of such duration as to render it impossible to care for the child for extended periods of time.

"\* \* \* \* \*

"(d) Physical neglect of the child.

"(e) *Lack of effort of the parent to adjust his circumstances,* conduct, or conditions to make the return of the child possible *or failure of the parent to effect a lasting adjustment after reasonable efforts* by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"(3) The rights of the parent or parents may be terminated \* \* \* *if the court finds that the parent or parents have failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child* for one year prior to the filing of a petition. In determining such failure or neglect, *the court shall consider but is not limited to* one or more of the following:

"\* \* \* \* \*

"(b) Failure to maintain regular visitation or other contact with the child which was designed and implemented in a plan to reunite the child with the parent.

"\* \* \* \* \*." (Emphasis supplied.)

The basis for termination "must be established by a preponderance of competent evidence." ORS 419.525(2). We now review the record.

Phillip Zinzer (Phillip) is now six years old and Michael Paulson (Michael) is now seven years old. Mrs. Zinzer is the mother of both Phillip and Michael; Mr. Zinzer is the father of Phillip and the stepfather of Michael. Mrs. Zinzer testified she does not know who is the father of Michael. In 1971 a health department official reported that the Zinzers were living in a trailer without water and electricity, that the home was maintained in a filthy condition, and that the children were not adequately clothed. In August 1971 an order was issued that the children be placed under the temporary care, placement, and supervision of the Children's Services Division (CSD) pending an investigation. At the time Phillip and Michael were picked up, a CSD foster-care worker noticed animal feces on the ground in the area of the home and food left out on the table; he found Michael with Mrs. Zinzer by an animal pen, and Phillip was found asleep in an outdoor toilet. In November 1971 Michael and Phillip were declared wards of the juvenile court and they have been under the legal care of CSD ever since.

The Zinzer's circumstances have not changed significantly between the time Michael and Phillip were first placed in the custody of CSD and the time of the hearing on the petitions to terminate parental rights. Shortly before the hearing the Zinzers were living with Mrs. Zinzer's mother in a trailer house. At one time there were six people housed in the trailer. Garbage was piled up at the trailer house and the scene was described by a foster-care worker as "extremely nauseating."

The Zinzers had at least two addresses by July of 1974 and had six different addresses in 1973. They moved often because Mrs. Zinzer's mother was always moving and the Zinzers moved with her. For three weeks prior to the hearing Mr. Zinzer worked at junking cars, making about $50 the last week. For eight months prior to that he worked at trailer maintenance for about $300 a month but he quit because he thought his paycheck deductions were too large. The Zinzers have had marital problems and were separated at least once.

The Zinzers were examined twice by Dr. Russell Sardo, a clinical psychologist, and, at their request, were examined once by Dr. Marvin Greenbaum, a clinical psychologist. The evaluations of both doctors were fairly consistent. Mr. Zinzer was described as being essentially asocial and as having a personality pattern disorder called dissocial sociopathy. Dr. Sardo testified as to Mr. Zinzer's background and ability to understand and deal with children:

> "* * * I saw Mr. Zinzer as a man who seemed to be quite lacking in judgment, showing almost no understanding whatsoever of the needs of young children.

> "He appeared to be an individual who had been unable to sustain a relative responsibility of a constant way of life both in the period in which I had experience with him and in his past history."

Dr. Sardo's testimony was not contradicted—and was in fact supplemented—by the testimony of Dr. Greenbaum who was called as a witness by the Zinzers.

Mrs. Zinzer is a very limited woman. Dr. Sardo testified:

> "A * * * * *

"It was my feeling that she is sustained primarily by Mr. Zinzer. That Mrs. Zinzer is a woman who lacks the capacity to function as an individual and will have to * * * function mainly on support of someone else. This is provided by Mr. Zinzer.

"* * * [On tests which were administered] Mrs. Zinzer scored in the lowest one-third which would place her [functioning] somewhere in the lower part of the educable retarded range * * *.

"Her typical responses seemed to be very flat without any indication of warmth or response of emotion.

"She showed a lack of capacity to understand most of what we were saying as indicated by her response when I spoke about the children, their needs and how these children had been harmed by the life pattern there and we spoke further about the existence that they were maintained in, their life patterns and therefore the logical conclusion was that the children would not benefit, as a matter of fact, they were harmed. I would say she nodded 'yes', she agreed to that but it could not extend further. That, yes, she should either change or get rid of the children, that seemed to be lacking * * * [she has an] inability to comprehend.

"I specifically requested that I see them again the second time to elaborate my diagnostic implementation and I felt at that time that the evidence of retardation is probably on a functional basis. That is, this is not due to any physiological or organic limitation, but that this is a symptom of a probably almost life-long emotional problem which I think might best be described as a chronic degenerative process.

"It is evidenced that in general social, emotional, vocational and educational inadequacy and the likelihood is that there will be continued deterioration. This pattern fits the attitude of inadequacy and a simple psychological kind of test.

"Q What in light of what I gather you are

saying, number one, that she is retarded and number two, that she suffers from either, from a condition of simple schizophrenia or—

"A   Or presimple schizophrenia.

"Q   What is in your opinion, Doctor, Mrs. Zinzer's capacity to provide the basic services, if you will, that a mother is expected to provide to small children?

"A   I think she has no comprehension of these services. I think that functioning in terms of her own needs is probably quite taxing."

Again, Dr. Greenbaum's testimony was not contradictory and in many respects supplemented Dr. Sardo's statements.

■ The conduct or conditions of the parents cannot be examined in a vacuum for they are not absolute factors in terms of ORS 419.523. Rather, we must examine the Zinzers in light of the effect their circumstances have had and might have in the future upon Michael and Phillip; our primary consideration is the best interests of these children. *State v. Blum,* 1 Or App 409, 463 P2d 367 (1970).

The evidence established that both Michael and Phillip had emotional problems. In school Michael had problems adjusting, and he was aggressive toward other children. In the first two of three foster homes he has been in he was extremely aggressive, had temper tantrums, had a short attention span, and had difficulty accepting discipline. Phillip has had even more problems, and had to be removed from his first foster home because he was continuously aggressive—striking other children—and stubbornly refused to accept discipline. He wet his bed every night and continuously wet his pants during the day, had temper tantrums and was unable to relate to children of his own age. He

was referred to a mental health clinic. In January 1973 one psychologist warned that Phillip might have autistic and some schizophrenic tendencies and, if the right foster home weren't found, he might have to be institutionalized.

By the time of the July 1974 hearing both boys had shown significant improvement. Phillip had been in one foster home for a year and a half; he had begun to gain weight and to grow; he had stopped throwing tantrums; he did not wet his bed unless he "got worked up" and he was an affectionate child. Michael had been in one foster home since August 1973, and his foster parents testified he had been cooperative, happy and well-behaved.

However, there have been several occasions when the problems of Michael and Phillip have resurfaced. During the time the boys have been under CSD care, visitation programs have been established as part of attempts to promote reunification of the Zinzers with Michael and Phillip. Between August 1971 and February 1972, Mr. Zinzer saw the children twice. In February the court set up a monthly visitation program, but between February 1972 and November 1973 the Zinzers visited the boys only nine times. The only known reasons were that the Zinzers were at long distances because they were moving frequently, and they had transportation problems. In November 1973 a period of more intense visitations began. The evidence indicated that Michael and Phillip became very upset as the visits occurred more frequently. Phillip could not sleep, started wetting his bed again, and became very insecure, wanting to have his foster parents with him in circumstances where he previously was willing to be alone. Michael became defiant, drew into a shell,

and started acting up in school. He would refuse to visit. Michael's situation deteriorated so badly that the visits with the Zinzers were moved from his foster home to CSD offices, and then were temporarily discontinued. Phillip expressed a fear that the Zinzers would take him away, and at the request of his foster parents visits were also scheduled at CSD offices instead of at his home.

Evidence also established that there was relatively little interaction and affection shown between the Zinzers and Phillip or Michael, either during the visits within the foster homes or during the visits at the CSD offices. The last visit with Michael was December 21, 1973, and visitations with Phillip were discontinued in March 1974.

After discussing the problems of Michael and Phillip, Dr. Sardo responded to questions about their needs:

"A These children do have problems. There has been, I think, a remarkable improvement in these children from the first time I saw them and from the descriptions that were given about their functioning and their behavior when they first entered foster placement. I think remarkable is the only appropriate term.

"I think, well, I feel unequivocally that the children need to have a permanent identification with the family. That that family be sensitive and perceptive enough to their needs and committed enough to them as individuals, the capacity to love and to care, that they will be able to remain invested with these children and deal with their problems as they arrive.

"They obviously have to have a fairly high frustration threshold because these children will test them and then it will be frustrating. They ob-

viously have to have a capacity to respond with support and judgment and with affection and love even when frustrated.

"That, I think, considering their age is the most appropriate therapy that can be provided. It may be at some time in the future when they are a little bit older and in school that additional professional help might be warranted, but the professional help would have to be considered as auxiliary to the provision of an effective family environment.

"Q  An approach to these children that you have just described, Doctor, can that be provided by either Mr. or Mrs. Zinzer or by them together?

"A  No."

Dr. Greenbaum also testified that continuity and stability in their emotional and physical lives were most important to Phillip and Michael. In that context, Dr. Greenbaum thought Michael might be able to "tolerate" a visitation program beginning *six months to a year* in the future. Dr. Greenbaum thought Phillip to be "more vulnerable" and stated he would be *more cautious* in terms of establishing a visitation program. Dr. Greenbaum also expressed, on cross-examination, his opinion as to the ability of the Zinzers to care for the children:

"Q  * * * Dr. Greenbaum, I would like to ask you whether Mr. and Mrs. Zinzer will be a substantial resource to these children and only in the following context. Can Mr. and Mrs. Zinzer provide for these children in their own home?

"A  Allow me to turn your question around a little bit and see if you find the answers. I want to emphasize the word[s] 'these children' and I want to emphasize the word[s] 'at this time,' and I give the answer in this way.

"These children are children who are vulnerable to certain kind of situations. They are who, I think

have experienced life situations which are depriving. I believe they place more strain, place, put more need upon the depth and continuity of parenting care than might youngsters who haven't had the experiences they have already had in life and are not reacting the way they are. To that end of the question, that is, could these children—I believe that Mr. and Mrs. Zinzer at this time would not provide what I would be considering the type of care which would enable them to grow in the—in a way that would not be destructive to them.

"* * * * *

"Q Doctor, speaking in very practical and realistic terms, what can happen in the foreseeable future that would make it possible for those children to live with these parents?

"A To make it healthy for the children, in other words?

"Q Yes?

"A I will answer that by saying I don't think there is any practical way that that would change the present situation."

Dr. Sardo's testimony as to the capabilities of the Zinzers, in terms of the needs of the boys, sums up the evidence:

"Q Dr. Sardo, is there any service, social service that could be provided to Mr. and Mrs. Zinzer in their own home that in your opinion would permit them to be able to provide for these two children?

"A No, no, I don't. If we view even the needs of the children in the most basic terms, terms of providing basic physical needs, the appropriate service would be a homemaker who would in effect be providing most of the help, and there is no guaranty that this kind of functioning would sustain itself, but obviously the needs of the children are much more extensive than that and *I can't see any way in which we could help these people acquire*

*the sufficient desire and dedication and also the capacity to provide these."* (Emphasis supplied.)

The trial court, in refusing to terminate parental rights, found that "[t]he termination of visitation privileges made it impossible for the parents to have any opportunity to show whether they desired [or were able] to maintain visitation * * *" and that "[t]ermination of visitation privileges made it impossible for the parents to indicate by their conduct what their parenting abilities may be." The trial court also found that the Zinzers "have some limitation on their mental acuity," but that mental ability and type of parental care are "relative things."

We interpret this case differently. The evidence established that Mrs. Zinzer suffers from an emotional illness and retardation, that Mr. Zinzer is somewhat mentally deficient, and that because of these factors it will be impossible for them to meet the needs of Michael and Phillip, even with extensive assistance. There is evidence that Phillip and Michael were physically and emotionally neglected before they were taken in custody by the CSD. In the context of the nearly three years which passed between the original custody order and the hearing on termination of parental rights, the Zinzers made only a minimal effort and were unable to readjust to make their circumstances, conduct, or condition compatible with being parents to the children. While it is true that visitation was terminated by CSD, this only occurred after two and one-half years of attempts to bring the Zinzers together with Michael and Phillip had failed and the visits appeared to be damaging to the boys.

Unlike *State v. Grady,* 231 Or 65, 371 P2d 68 (1962), where termination was not approved, there is

very little evidence here that the Zinzers may be able to adequately resume their parental duties; in fact, the weight of evidence here is to the contrary. Unlike *State v. McMaster,* 259 Or 291, 486 P2d 567 (1971), where termination was not allowed, there is clear— and, in fact, largely uncontradicted—evidence that not only the Zinzers' conduct but their condition as well has been seriously detrimental to Michael and Phillip.

The trial judge hesitated to terminate because he questioned whether the Zinzers were provided with sufficient time to adjust their *circumstances* and *conduct.* However, the record here provides substantial evidence that because of their *condition* the Zinzers cannot be expected to care for Michael and Phillip in the future. We conclude that this misfortune should not be visited upon the children and the evidence persuades us that termination is proper in this case. *See State ex rel Juv. Dept. v. Archuletta,* 12 Or App 596, 506 P2d 540, Sup Ct *review denied* (1973). *See also State ex rel Juv. Dept. v. Wade,* 19 Or App 314, 19 Or App 835, 527 P2d 753, 528 P2d 1382 (1974), Sup Ct *review denied* (1975); *State ex rel Juv. Dept. v. McMaster,* 18 Or App 1, 523 P2d 604, Sup Ct *review denied* (1974); *State ex rel Juv. Dept. v. Patton,* 5 Or App 450, 485 P2d 653 (1971). As we said in *McMaster:* " '* * * The best interests of the [children] are paramount * * *.' " 18 Or App at 11.

■ The preponderance of the evidence in this case supports the termination of parental rights, pursuant to ORS 419.523(1), (2) and (3), of Eugene and Jeannie Zinzer to Phillip Zinzer and of Jeannie Zinzer to Michael Paulson.

Reversed and remanded.