Argued November 17, 1969, affirmed January 8, 1970

IN THE MATTER OF DAVID EUGENE BLUM,
A MINOR CHILD,
STATE OF OREGON, *Respondent, v.*
CARLENE BLUM, *Appellant.*

467 P. 2d 367

*Ted E. Runstein,* Legal Aid Service, Portland, argued the cause for appellant. With him on the briefs was Ronald I. Gevurtz, Legal Aid Service, Portland.

*Elizabeth Preston,* Deputy District Attorney, Portland, argued the cause for respondent. On the brief were George Van Hoomissen, District Attorney, and Richard J. Knapp, Deputy District Attorney, Portland.

AFFIRMED.

LANGTRY, J.

This appeal questions whether the parental rights of a mentally ill mother of an illegitimate child may be terminated under the provisions of ORS 419.523(2)(a). The defendant is unable to provide physical or emotional care for the child, and competent medical testimony indicates her condition is probably permanent.

The child involved was born September 30, 1962, and is one of the defendant's three children. The defendant was committed to Dammasch State (mental) Hospital on July 2, 1963. At the time of the hearing on the petition to terminate parental rights, May 31, 1967, she had been in and out of the state hospital

four times. She was represented by counsel and a guardian ad litem. Her diagnosis by a staff psychiatrist of the state hospital was "personality pattern disturbance, inadequate personality superimposed on schizophrenic reaction, chronic, simple type."

Dr. Carl V. Morrison, psychiatrist and Director of the Community Child Guidance Clinic in Multnomah County, who had examined defendant, testified that she suffered from "Paranoid schizophenia [sic], chronic." He stated that the prognosis is that the defendant will never be able to care for the child. No evidence to the contrary was offered.

The record shows that defendant's illness, in its recurrent serious manifestations, includes frequent bizarre hallucinations, often involving feelings of severe physical persecution by the doctors in whose charge she was placed; long continued periods of depression in which she is hysterical and cries continuously; refusal to accept simple responsibility involving her own personal care; and rejection of any responsibility for her child.

During periods when defendant was out of the hospital, she was under supervision in boarding-house situations in Portland. The child also lived in a foster home in Portland. Until April 14, 1967, defendant was urged by caseworkers to visit the child, but made only one visit. In the order terminating parental rights, the trial judge found, *inter alia:*

"* * * * *

"c. Carlene Blum * * * will be unable to provide care for the * * * child in the foreseeable future.

"d. The * * * mother * * * has shown no interest in the * * * child up until the date

of April 14, 1967, at which time this court denied any future visitation * * *.

"* * * * *

"f. * * * [T]he child has remained in foster care with supervision provided by the Multnomah County Public Welfare Commission since on or about the 27th day of August, 1963.

"5. The court further finds, having been involved with this case for over a year and having given considerable thought to the issues presented concerning the rights of parents and the right of a child, that the mental illness of the mother of the above-named minor child is a condition which was contemplated by the Legislature as basis for termination of the parental rights of a parent.

"6. The court further finds * * * that the mental condition of (Mrs.) Carlene Blum, which condition is incurable within the foreseeable future and seriously detrimental to the child, has made her unfit as a parent and that for the best interests of the above-named minor child the parental rights of the said Carlene Blum, mother of the above-named minor child, should be permanently and irrevocably terminated * * *."

The trial court's judgment was legally based upon ORS 419.523(2)(a), which provides:

"* * * * *

"(2) The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents:

"(a) Are unfit by reason of *conduct or condition* seriously detrimental to the child * * *." (Emphasis supplied.)

Defendant's "condition" renders her unfit to have the child's care; therefore, a simple application of clear language indicates the trial court was right.

However, the defendant contends that the statute implies that the mother must have, through her conduct, "created a condition" seriously detrimental to the child, and cites several Oregon cases as support. In *Simons et ux v. Smith,* 229 Or 277, 366 P2d 875 (1961), it was said that "The reason for terminating parental rights ought to be related to the parent's conduct as a parent." In that case the statute in question here was not involved. There, the natural father of the child was objecting to a petition by his former wife and her present husband to adopt his children. Therefore, where the court was speaking of "terminating parental rights" it was not speaking of ORS 419.523 (2)(a). Defendant cited five cases in which the statute here in question was quoted by the Oregon Supreme Court. The court in none of them had reason or attempted to construe the meaning of the word "condition," with reference to mental illness.[1]

In *State v. Grady,* Footnote 1, supra, it was held that the rights of the mother could not be terminated because she was in prison. The trial court had found that the mother's parental rights should be terminated

---

[1] State v. Jamison, 251 Or 114, 444 P2d 15 (1968); State v. Winters, 243 Or 313, 413 P2d 425 (1966); State v. Grady, 231 Or 65, 371 P2d 68 (1962); Cutts v. Cutts, 229 Or 33, 366 P2d 179 (1961); and State v. Easley (Hull), 228 Or 472, 365 P2d 293 (1961). In State v. Grady, supra, 231 Or at 67, the court stated that the statute provides for termination where the parent is unfit by reason of "conduct or conditions seriously detrimental to the child." (Emphasis supplied.) As noted in text the language of the statute is "conduct or condition." In State v. Easley (Hull), it appears that the court was under the impression that the statute's requirement is that the parent's "conduct *and* condition must have been seriously detrimental to the welfare of the children." (Emphasis supplied.) 228 Or at 473. In these cases, the possible misapprehension of the court as to the actual language of the statute may have had a bearing upon the decisions made. In the other three cases the issues all revolved around parental "conduct" as distinguished from "condition."

by reason of her conduct and her condition of being in prison and thus unable to care for her child. The Supreme Court reversed, indicating that the mother's rights to the child should be preserved as an aid to the mother's possible rehabilitation. This, as a reason, counters the familiar principle that in proceedings of this nature the best interests of the child are the prime consideration. There is no reason to believe the legislature intended to place the interest of a parent ahead of those of a child.[2] The "condition" of the mother in *Grady* was that she would spend several years in the penitentiary. The court reasoned she would then be free and in a position to take care of her child. That does not parallel the case at bar. Here, there is little prospect that the child can ever be in the moth-

---

[2] The committee which prepared it, in its report tendering the act, including the statute in question, to the legislature, said:

"* * * [P]resent law represents altogether too great an emphasis on the rights of the parent and too little emphasis on * * * *the interests of the child* * * *." (Emphasis supplied.) Report of the Legislative Interim Committee on Judicial Administration, PART II Juvenile Law 22-23 (1959).

In discussing State v. Grady, supra, in his article entitled *Trends in Oregon Family Law,* 43 Or L Rev 193, 209 (1964), Professor Paul Larsen said:

"* * * The court was concerned about the possible adverse effect on the mother's rehabilitation which might result from her daughter being taken away from her; this concern seems to have clouded its view of all of the evidence of unfitness. The best interests of this child seem to have been sacrificed in a speculative effort to promote the best interests of her mother."

Proceeding on, Professor Larsen criticized State v. Easley (Hull), Footnote 1, supra:

"Here again we see the court manipulating the clear language of a statute to impede an effort by the state, acting through the juvenile court, to reshape a family relationship. The court's attitude toward legislation in this area borders on hostility. Most of the other cases discussed in this article [including Cutts v. Cutts, Footnote 1, supra] buttress this conclusion * * *." 43 Or L Rev at 209.

er's care; indeed, there is little prospect the child will become other than a boarder with any family if the mother's rights remain outstanding.

In 39 Or L Rev 305, 312 (1960), the Honorable RALPH M. HOLMAN, who was chairman of the interim subcommittee which prepared and submitted the juvenile code to the Oregon legislature, including the part of the act in question here, explained:

"* * * [T]he emotional welfare of the child requires that he be integrated as a member of a family * * *.

"It was the feeling of the committee that a child would never have an opportunity to be completely integrated in another family as long as any legal relationship, privileges, or responsibilities whatsoever remained with respect to his real parents. Thus, the child's emotional well-being and his resultant relationship to society in truth require not only a permanent severance of custodial rights but of all rights."

Dr. Morrison, after testifying to his diagnosis of defendant, said that it would be damaging to the child to be with defendant. He enlarged on that answer by stating:

"It's damaging in this way: In that the emotional well-being and growth and confidence that a child needs must come from his immediate environment and particularly people in which his custody is charged, that is his own parents or the parents with whom he is living. This is something that is acquired very directly by living with people, not just what they say but the reactions that the adults have. They absorb the strength or the weaknesses, the health or sickness of the person with whom they live."

The defendant's answer to this is that she is not seek-

ing custody of the child, she simply does not want her parental rights to be terminated.

■ It is important that the child have a sense of belonging to a family. This is one of the things we look for after we say that our prime consideration is the best interests of the child. It is not in the best interests of the child to keep him forever in a limbo— a limbo that is terminated, if at all, when on some uncertain date his mentally ill mother recovers and gives him normal mother's care. For this child it may well be that at his present age of seven and one-half years it is already too late to successfully integrate him into a family. If it is not too late, it is important to get it done soon.[9]

■ We hold that the use of the word "condition" in ORS 419.532(2)(a), separated by the disjunctive from the word "conduct," is clear.

"In the construction of statutes the governing rule to be followed and the one which is law and binding upon the court is to ascertain and declare the legislative intent. ORS 174.010 and 174.020 * * *.

---

[9] Cf. Carl P. Malmquist, M.D., *The Role of Parental Mental Illness in Custody Proceedings* 360, 364-65 (Vol. II, No. 4, ABA Family Law Quarterly 1968). At page 374 of the same article, Dr. Malmquist says:

"'Closeness to a mother in a depressive phase, or a schizophrenic episode may give rise * * * to the kind of after-effect which shows up years later * * * as the starting point for mental trouble.' * * * There is also evidence that the chronicity of an illness in a parent, be it psychological or even physical, may be a contributory factor to emotional disturbance in a child due to the social and familial disruption which is attendant upon any long-standing disease. In part this is also due to the greater stresses put on a family with a mentally ill parent, especially if it is the mother." (Dr. Malmquist is associate professor of Child Development and Psychology, University of Minnesota, and adjunct professor of law at the University of Minnesota and psychiatric consultant to the District Court in Minneapolis.)

"It is elementary that when the legislature, in enacting a law, makes use of plain, unambiguous, and understandable language, it is presumed to have intended precisely what its words imply. There is no occasion to go beyond those words and their plain meaning to ascertain by application of rules of statutory construction the legislative purpose." *Franklin v. State Ind. Acc. Com.*, 202 Or 237, 241, 274 P2d 279 (1954).

We reject, because the clear language of the statute does not say or imply it, the contention that a parent must, by some conduct "create" a condition which causes the parent to be unfit before the parent's rights can be terminated.

We are aware of the gravity of separating a child from his natural parent. A court's judgment terminating parental rights under this statute must be supported by a preponderance of the evidence, proving (1) that the parent is presently unable to supply physical and emotional care for the child (if necessary, with the aid of social agencies available), and (2) that this condition will probably continue for time enough to render improbable successful integration of the child into a family if the parent's rights are not terminated. The evidence in this case supports the findings made by the trial judge.⊛

Affirmed.

---

⊛ A 1961 publication of the Children's Bureau, Social Security Administration of the United States Department of Health, Education and Welfare, entitled *Legislative Guides for the Termination of Parental Rights and Responsibilities and the Adoption of Children*, agrees with this result. The "legislative guides" were attained after extensive study throughout the United States and with the aid of many legal and social service experts. On pages 14, 15, and 16 of this publication appears:

"The following are recommended as grounds for invol-

untary termination * * * (c) that the parent is unable to discharge parental responsibilities because of mental illness or mental deficiency, and there are reasonable grounds to believe that such a condition will continue for a prolonged indeterminate period.

"* * * * *

"* * * [P]hysical incapacity * * * should not be a ground [to terminate parental rights] because the parent could still give the child love and affection * * *. Therefore, there would be no need to sever the natural relationship. Even when a parent has to be hospitalized indefinitely for physical reasons, it is felt that a continuation of the natural tie is of great importance to the child and his parents. Moreover, with rapid advances in medical knowledge, some disabling conditions might be corrected in the near future * * *.

"Opinion is divided on whether mental incapacity should be a ground for termination. One viewpoint is that * * * a mental condition considered incurable today may be amenable to treatment tomorrow; therefore, mental incapacity should not be a ground for termination. The opposite view is that there are situations in which substantial evidence can be produced of severe mental illness * * * of a permanent nature * * * *here the natural tie should be severed* to permit the child to have meaningful parental relationships through adoption.

"* * * * *

"In any instance of parental incapacity, it is not the incapacity by itself that is a ground for involuntary court action but rather it is where the incapacity renders the parent unable to discharge parental responsibilities for a prolonged indeterminate period." (Emphasis supplied.) Children's Bureau, Pub. No. 394—1961.