Argued March 20, affirmed April 14, reconsideration denied
May 14, petition for review denied May 28, 1975

IN THE MATTER OF BOBBIE JEAN GONZALEZ, A CHILD.

## STATE EX REL JUVENILE DEPARTMENT OF CLACKAMAS COUNTY ET AL, *Respondents, v.* GONZALEZ (Case No. 7824), *Appellant.*

and

IN THE MATTER OF DAVID REY GONZALEZ, A CHILD.

## STATE EX REL JUVENILE DEPARTMENT OF CLACKAMAS COUNTY ET AL, *Respondents, v.* GONZALEZ (Case No. 7825), *Appellant.*

### 533 P2d 1382

*Phil H. Ringle, Jr.,* Gladstone, and *David C. Bond,* Portland, argued the cause and filed the brief for appellant.

*Elizabeth Welch,* Deputy District Attorney, Oregon City, argued the cause and filed the brief for respondent Juvenile Department.

No appearance by respondent Children's Services Division.

Before Schwab, Chief Judge, and Foley and Thornton, Judges.

FOLEY, J.

These are appeals by Mrs. Delores Hansen Gonzalez from orders committing her two children, Bobbie Jean and David Rey, to the Children's Services Division of the state of Oregon (hereafter CSD) and terminating Mrs. Gonzalez' parental rights. The cases have been consolidated for purposes of appeal.

The Gonzalez children were not represented by legal counsel in the termination proceeding. Mrs. Gonzalez first asserts that the trial court should have appointed legal counsel to represent the interests of her two children. The orders terminating her parental rights were entered on July 24, 1974, and Mrs. Gonzalez filed her notices of appeal on August 21, 1974. In *State ex rel Juv. Dept. v. Wade,* 19 Or App 314, 19 Or App 835, 527 P2d 753, 528 P2d 1382 (1974), Sup Ct *review denied* (1975), decided on October 28, 1974, we held "that independent counsel must represent the children in all termination proceedings." 19 Or App 323. We therefore are faced with the issue of whether *Wade* should be retroactively applied, and, if so, the extent of that application.

The Oregon Supreme Court has recently reviewed its decisions on retroactivity, and has drawn two conclusions therefrom:

"* * * First, we are free to choose the degree of retroactivity or prospectivity which we believe appropriate to the particular rule under consideration, so long as we give federal constitutional rights at least as broad a scope as the United States Supreme Court requires. Secondly, we have tended to restrict the retroactive application of newly-announced rights, giving them only the application which the Supreme Court has adopted as a minimum. * * *" *State v. Fair,* 263 Or 383, 387-88, 502 P2d 1150 (1972).

The *Fair* decision contains a useful discussion of Oregon cases following various retroactivity rules. In *Fair* the Oregon Supreme Court noted that it has "closely followed the retroactivity rules adopted by the United States Supreme Court." 263 Or at 385.

Generally, the United States Supreme Court's criteria for determining the retroactivity of its new rules are as follows:

1. The purpose to be served by the new rule.

2. The extent of the reliance which has been placed upon the old rule.

3. The effect on the administration of justice of the retroactive application of the new rule.

*See, e.g., Halliday v. United States,* 394 US 831, 89 S Ct 1498, 23 L Ed 2d 16 (1969); *Desist v. United States,* 394 US 244, 89 S Ct 1030, 89 S Ct 1048, 22 L Ed 2d 248 (1969); *DeStefano v. Woods,* 392 US 631, 88 S Ct 2093, 20 L Ed 2d 1308 (1968). *See also,* Annotation, 22 L Ed 2d 821 (1970).

The purpose to be served by the rule that independent counsel must represent the children in all termination proceedings was discussed at length

in *State ex rel Juv. Dept. v. Wade,* supra. The *Wade* opinion was based upon the concept of the right to counsel and stated that there was a need for separate legal representation for children in termination proceedings because neither the state nor the parents necessarily represented the best interests of the children—and the best interests of the children continue to be our main concern in such proceedings. In *Wade* we noted that it is possible that "children involved in these proceedings have interests which are unique to them, that is, shared with neither the state nor their parents * * *." 19 Or App at 321. We therefore found "that in *all* termination proceedings there are potential conflicts between the interests of the children and those of both the state and the parents * * *." (Emphasis theirs.) 19 Or App at 323.

■ In short, our decision in *Wade* was predicated upon a concern that the welfare of children may require, in certain circumstances, separate representation in termination proceedings, and, since such circumstances may not be known or may not exist in advance of the proceedings, the children should be represented by counsel in all proceedings.

In considering the possible retroactive application of this new rule, perhaps the most important consideration is its effect on prior termination proceedings. The granting of retroactivity to *Wade* would place in serious question all completed adoptions and every adoptive placement of children where parental rights had been terminated under ORS 419.523. The possible impact of such action, i.e., inviting the opening and reconsideration of all cases of any parent whose parental rights have been terminated in the past, is startling and unacceptable.

■ In summary, under previous procedures the interests of the children were supposed to be repre-

sented by counsel for the parents and the state. The requirements of *Wade* do not create a completely new concept; rather, *Wade* seeks to enhance the representation of the interests of the children where it has already existed. Additionally, parties to proceedings which were final prior to *Wade* had every reason to believe they were relying on proper procedures. Finally, we think much more harm, and in many cases, serious detriment, would result for the children were we to allow the reopening of proceedings which are now final. For these reasons we decline to give the *Wade* decision retroactive effect.

We turn now to the question of termination of the parental rights of Mrs. Gonzalez. The grounds for termination are related in ORS 419.523.[1]

---

[1] The provisions of ORS 419.523 which are pertinent here are:

"(1) The parental rights of the parents of a child within the jurisdiction of the juvenile court as provided in subsection (1) of ORS 419.476 may be terminated as provided in this section and ORS 419.525. The rights of one parent may be terminated without affecting the rights of the other parent.

"(2) The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents are unfit by reason of conduct or condition *seriously detrimental* to the child *and* integration of the child into the home of the parent or parents is improbable in the forseeable [sic] future due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(a) Emotional illness, mental illness or mental deficiency of the parent of such duration as to render it impossible to care for the child for extended periods of time.

"(b) Conduct toward any child of an abusive, cruel or sexual nature.

"(c) Addictive use of intoxicating liquors or narcotic or dangerous drugs.

"(d) Physical neglect of the child.

"(e) *Lack of effort of the parent to adjust his circumstances, conduct, or conditions* to make the return of the child possible *or failure of the parent to effect a lasting ad-*

David Rey Gonzalez is now four years old, and Bobbie Jean Gonzalez is nearly three years old. The children are healthy, average youngsters. Mrs. Gonzalez is separated from Mr. Gonzalez, who has voluntarily relinquished to the state of Oregon his parental rights. In August 1972, when Bobbie Jean was seven weeks old and David about one and one-half years old, Mrs. Gonzalez left the children at the Canby, Oregon, police station, explaining that she could not care for the children at that time because her marriage was breaking up, she was on the verge of a nervous breakdown, and she did not have the necessary finances. At the time Mrs. Gonzalez turned the children over to the authorities, dark spots were noticed on Bobbie Jean's buttocks. A medical doctor who saw Bobbie Jean testified that he thought there was a "good likelihood" that the spots constituted a Mongolian spot (a spot present at birth which fades over time) as well as bruises, although there was no indication of the skin having been broken and there was not enough swelling to recognize the marks as bruises. The doctor described Bobbie Jean as "vigorous and healthy" at the time. The cause of the bruises, if

---

*justment after reasonable efforts by available social agencies for such extended duration of time* that it appears reasonable that no lasting adjustment can be effected.

"(3) The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents have failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child for one year prior to the filing of a petition. In determining such failure or neglect, the court shall consider but is not limited to one or more of the following:

"(a) Failure to provide care or pay a reasonable portion of substitute physical care and maintenance if custody is lodged with others.

"(b) Failure to maintain regular visitation or other contact with the child which was designed and implemented in a plan to reunite the child with the parent.

"* * * * *." (Emphasis supplied.)

bruises were present, is uncertain and both Mr. and Mrs. Gonzalez have consistently, vigorously denied ever having caused the bruises.

In any event, after Mrs. Gonzalez left the children with authorities, she desultorily carried out a short-term visitation program and by January 1973 Mrs. Gonzalez claimed to be interested in having custody of the children and the CSD was willing to return the children to Mrs. Gonzalez if she could provide adequate housing. At that time Mrs. Gonzalez was provided with an Aid to Dependent Children (ADC) grant which CSD authorities thought was to be used to gain adequate housing so the children could be returned to her. The return was to occur on February 1. However, Mrs. Gonzalez received the grant money and left the area, traveling to California, ostensibly to look for work. She testified she worked about a month around February in 1973 for Real Plastics, Costa Mesa, California, then she returned to Oregon "for court." Then in May 1973 she returned to California where she said she was employed in and out of Costa Mesa. She described that employment as follows:

"A * * * Oh, yeah, I was truck driving.

"Q And where was that?

"A In and out of Costa Mesa, McGregor Automotive.

"Q How long did you have that job?

"A Well, I wasn't directly working for them, you know, I was driving with my boy friend.

"Q Did you obtain a salary for that?

"A Yeah, from him.

"Q How much?

"* * * * *

"Q  (By Ms. Welch continuing)  How much did you make in the truck driving?

"A  I didn't make any certain amount.  See, we were livng together, you know.

"Q  And you were being supported by this other person, is that right?

"A  Uh-huh.

"Q  When did you next make any salary?

"A  I started working for, about — in April?

"Q  April?

"A  Yeah, I started working at Bobbie's Box as bar manager.

"Q  April of which year?

"A  This year.

"Q  So you have not been employed since Real Plastics?

"A  No, I didn't have to work.

"Q  You didn't have to work?

"A  No."

From January 1973 until June 1974 (just prior to the termination hearing), Mrs. Gonzalez was in California most of the time.  She did visit the children when she was in Oregon by making arrangements with the foster parents.  But she apparently made no effort to work with the Children's Services Division to work out a program for return of the children to her.  The caseworkers testified that they tried to make and keep contact with her but it was impossible.  Mrs. Gonzalez herself testified to her unwillingness to let them know where she was living:

"Q  All right, is it true you didn't tell Mrs. Lagge different times when she was a case worker exactly where she could reach you?

"A  Because I was moving around too much and it wasn't steady and I would rather, I don't know, I would rather not her know the in between.

"Q You would rather not know what?

"A I would rather not her know where I was than know, how would you say it — I would rather her not know where I was than, you know, because I moved so much. I didn't stay too long, I didn't live in one place for months and months and months.

"Q Did you keep in contact with her?

"A Not too frequently, but when I came up here I did.

"Q Why was it you didn't want her or whoever the worker was to know that you were at your parents' home when the children were there?

"A Every time it was the same thing. I would come up and they would ask me the same questions over and over again, like everything was going to change in a month.

"Q Like what was going to change?

"A My husband, my employment, you know, just everything."

Mrs. Gonzalez contends that CSD exerted little effort to help her in plans to be reunited with her children, but the record indicates rather that she did not give CSD any real opportunity to help her in this regard. The hearing was on Monday, July 22, 1974. Mr. Gonzalez testified that on the Wednesday prior to the hearing Mrs. Gonzalez came to him and told him that she was going to give up her parental rights to the children as he had done because "she couldn't take * * * the responsibility of her job and the kids * * *."

The trial judge analyzed the situation as follows:

"There is no task that a Judge is asked to perform that is more difficult than the one now facing this Court.

"If my ultimate decision were predicated on the interest of the grandparents of these two kids and their devotion to the children, and if I could make

a decision predicated on that I would have to say that the Court cannot and should not terminate Mrs. Gonzalez's parental rights to the children,[2] but that is not the criteria.

"The criteria is whether or not there is any hope in the foreseeable future that Mrs. Gonzalez as mother of these children can perform as a mother for the children. Is there any chance that leaving Mrs. Gonzalez in the relationship of mother to these children that she is ever going to be able to actually be a mother to them. That these children are ever going to have anything approaching a normal home, as we customarily think of this, and in making this decision the Court is bound, of course, to view the possibilities in light of the [aid] and sustenance that could be afforded Mrs. Gonzalez, public assistance, Aid to Dependent Children, this sort of thing.

"These children now, David is three and a half exactly today, Bobbie Jean is two years and one month exactly today and the testimony of the mother is simply one who has visited them occasionally in the last two years.

"I must say that as I have heard the testimony, as I have seen Mrs. Gonzalez in court, and knowing what has transpired in the past two years, I can foresee for those children if I do not terminate Mrs. Gonzalez's parental rights nothing but residing in foster homes from here on out with an occasional visit from a mother who would like to retain a relationship without anything beyond that, without being a responsible parent.

"I cannot visualize with any aids available to her, all the help that her parents could give and would give of her being a mother to these two chil-

---

[2] From this language in the trial court's oral opinion, we take it that the court concluded, and not without reason, that the ones who were especially interested in Mrs. Gonzalez' retaining her parental rights in the children were the grandparents rather than Mrs. Gonzalez.

dren. I'm sorry but we as human beings can only foresee what is going to happen in the light of what has happened.

"Mrs. Gonzalez has characterized herself as not having been able to do a better job up to this point because she was a bit wild, she said. I think that character probably as she says has not been markedly changed.

"The Court finds that each of the allegations of the petition in each of the cases are true. That the mother has in addition to that, that the mother has without just cause neglected the children, failed to provide for them, failed to respond as a mother and that in the opinon of this Court she does not have the ability within the foreseeable future to make the changes that are necessary to place her in a position of being a mother to these children.

"Her parental rights therefore will be terminated."

■ We agree with and adopt findings and conclusions of the trial court. *See also State ex rel Juv. Dept. v. Zinzer,* 20 Or App 688, 533 P2d 355 (1975).

Affirmed.