Argued April 23, affirmed May 12, reconsideration denied
July 2, petition for review denied August 6, 1975

In the Matter of Moody, Donald and Shawn, minor
children.
## STATE ex rel JUVENILE DEPARTMENT OF MULTNOMAH COUNTY, *Respondent, v.* WAGNER (No. 30,851), *Appellant.*
### 535 P2d 102

*Deane Sterndale Bennett,* Portland, argued the cause and filed the brief for appellant.

*Betsy Welch,* Deputy District Attorney, Portland, argued the cause for respondent. With her on the brief was Harl Haas, District Attorney, Portland.

Before Schwab, Chief Judge, and Foley and Fort, Judges.

FOLEY, J.

This is an appeal from an order of the Circuit Court for Multnomah County terminating the parental rights of the mother Sandra Wagner in and to Donald Moody, now 11[1] years old, and Shawn Moody, now nearly 10[2] years old. We affirm.

The children have been in foster care since 1967 and in the same foster home since April 19, 1970. The occasion for their being placed in a foster home in 1967 was the neglect of the mother to take proper care of them. From that time forward the mother made sporadic visits with the children.

On April 3, 1968, the mother gave birth to another child, Robert Moody. This child was placed in foster care by the welfare department in September 1969 and he was subsequently returned to his mother, then Mrs. Moody. Thereafter, in 1970, fearful that she would lose custody of Robert, Mrs. Moody moved to the state of Washington where she stayed for two years and made herself unavailable to the agencies interested in the children. After she returned to Oregon in 1972 she attempted to have visitation with the two children who are the subject of this proceeding. This visitation was commenced in January 1973 and whenever she visited them the children did not enjoy their mother's visit and they developed rashes and other medical problems, including recurrence of bedwetting, which had occurred during her previous sporadic visits.

In order to understand why the mother's visits

---

[1] Born April 17, 1964.
[2] Born September 8, 1965.

had such an unfavorable effect upon the children, the testimony of the psychiatrist, Dr. Carl V. Morrison, is enlightening. He interviewed the mother a number of times. He testified:

"* * * * *

"I found that the mother was intensely concerned about her own physical situation, she had many, many physical types of complaints. I felt that the mother's reasoning and her whole viewpoint was largely self-centered. She was concerned about herself and not primarily about the welfare of her children. I found that her capacity to understand the needs of the children aside from food, shelter and clothing was minimal, and I felt that she was sincere when she said she wanted to care for her children. And I felt that she was—did not have the capacity to profit either by experience or by education that might reflect itself as to how to care for children or their needs, emotional needs."

Dr. Morrison also, in 1974, gave her a psychological personality evaluation test, which was identical to a test given her in 1967 at the University of Oregon Medical School, in an effort to see whether she had been able to improve herself by altering her approach or her general outlook. He testified that she exhibited almost exactly the same traits; namely, that she was emotionally unstable, immature, lacked conformity, lacked self-control. He stated that she was functioning on the level of a person of "very dull normal borderline intelligence." His conclusion was that it would be damaging to the children to return them to the mother. It is a fair inference from his testimony that he does not believe the mother can improve or change.

At the request of the mother a hearing was held before the circuit court in January 1974 con-

cerning the desire of the mother for visitation. At that hearing it was disclosed in the testimony that visitation had been terminated by Children's Services Division (CSD) because of the adverse reaction of the children when visits were accomplished. The children were disinterested in their mother. The trial judge stated after the hearing that he was not necessarily hopeful that more visitation would do more than damage the children. However, he felt that since the mother insisted that she should have reasonable visitation, in order to see whether or not the visitation upsets could be overcome he ordered the visitation not less frequently than once every six weeks, with full review by the end of September 1974. The visits were accomplished then with adverse results. At one visit the children fought and the mother made no effort to interfere or stop the fighting. When the CSD attendant separated the boys and put them in different parts of the room, he asked the mother if she understood why the boys were upset, why it was they were fighting, and she responded that it was because of the visitation.

In May 1974 the mother moved for an order terminating the wardship of the two children. In response Children's Services Division filed a petition for termination of parental rights and a hearing was held on June 24, 1974, before the circuit court. At that hearing witnesses, including the children's mother, CSD personnel and others, were presented. Dr. Morrison testified as to the inadequacy of the mother[3] and the disturbing effect upon the children

---

[3]
"Q Now, Dr. Morrison, based upon all of the information that you have and observations that you've made, reported to the Court, do you think it's possible for these children to be reunited with their mother?

"A I would say it would be virtually an impossibility.

of the visitations, including the hostility of the children toward their mother. The circuit court then concluded:

"* * * * *

"The totality of the testimony adduced proved by clear, cogent and convincing evidence that the mother is incapable, because of the extended length of time in which there has been a complete lack of supervision between parent and child, of meeting the needs of her sons in order to insure that the children may be nurtured to healthy growth and development.

"The impact of the mother's lack of contact with the boys has had a serious detrimental effect; and, as demonstrated by the medical evidence, a continuation of the parent-child relationship would be further detrimental to the children's well-being and sense of identity.

"The reality of any positive ongoing relationship between mother and sons is unlikely any time within the foreseeable future.

"In applying the standards which are set forth in the statute, together with the testimony and exhibits, the clear and convincing evidence supports the conclusion that the mother, Mrs. Sandra

---

"Q Would you please explain?

"A I think these children are at such an age that they need a relationship with whoever they are going to continue to live with. And I think it's been demonstrated that they do not relate to their natural mother. I think that although [the mother] is a person who wants to have her children, I think she does not have the intellectual or the emotional stability to do this. It's my observation that she has been able to do only a marginal job with the one child who is younger. And I feel that she does not have the capacity to help the older child. I think one of the things that has convinced me of this is the fact that in her own growth she had a very stormy adolescence and I think this in turn was due to a feeling of rejection and a feeling of being compared to other children and basically upon her own lack of capacity, intellectual and emotional."

Wagner, is unfit by reason of conditions which are and will continue to be seriously detrimental to the children and that the well-being of the children, including their physical, psychological and emotional well-being, requires the termination of her parental rights.

"* * * * *."

The mother argues that since she has been permitted to have the custody of the youngest child, Bobby, that she has thus demonstrated her ability to take care of the other children. In this connection Dr. Morrison was asked:

"Q And you are aware that Bobby was returned to her?

"A Yes, I am.

"Q And circumstances have been such that the child continues to this day in her physical care and custody?

"A That's correct.

"Q The things you are saying would seem to relate to her ability generally as a parent. How can you reconcile the fact that she has been able to provide for this one child?

"A I think we have several reasons for this, and the fact that Bobby is the youngest of these children. She has had more contact with him. He is a different personality entirely from the other two. Also it has been much less complicated by the fact that Mrs. Wagner has had extensive help of the nature of which I was just describing. She's had extensive help [such as from Mrs. O'Toole, infra], there have been many other people who have been helping this child besides herself, and it has not been complicated by the fact that there is more than one. I think it very quickly gets to the point of complicating the situation when you have more than one child you have to look after."

Mrs. Vivian O'Toole, the school social worker

at Couch School, befriended Mrs. Wagner in October 1973 and attempted to help her. She observed that Mrs. Wagner would come to Bobby's kindergarten class "really almost like one of the children, eating out of the treat box and occupying the teacher's time, so she couldn't spend time with the children." Mrs. O'Toole saw her weekly until the end of school, counseled her and helped her, and while she was supportive of Mrs. Wagner, she observed that in her opinion it would not be appropriate to return the children to the mother and that it would be years before that could be considered due to a number of uncertainties in Mrs. Wagner's situation.

■■ In evaluating what has occurred in this case, the basic inadequacy of the mother, the alienation from the mother, the relationship which has developed between the children and the foster parents, these observations can be made: First, the children were in foster care due to parental neglect. Second, after the placement in foster care the mother, as an adult, had choices about her life which she exercised with the result that for over two years the children had no contact with her at all. Third, during her absences the children's needs apparently were satisfied by others, requiring the children to get along emotionally as best they could. The result has been that they have apparently become attached, rather naturally, to the foster parents. It seems clear from the evidence in this case that the children can no longer benefit from association with their mother. When a parent sets a course of events in motion which leads to alienation of the relationship with children, it is the parent's rights, not the children's, which must give way in such conflict. *State ex rel Juv. Dept. v. Wade,* 19 Or App 314, 19 Or App 835, 527 P2d 753, 528 P2d 1382 (1974), Sup Ct *review denied* (1975); *State ex rel Juv. Dept. v. McMaster,* 18 Or App 1, 523 P2d 604, Sup Ct *review denied* (1974); *State v. Blum,* 1 Or App

409, 463 P2d 367 (1970). Fourth, is the regrettable lack of capacity of the mother to cope both intellectually and emotionally; that is, her inability to meet the needs of these children and the improbability of the improvement of these conditions.

We conclude that no more time should be wasted in stabilizing the status of these children. To leave them in limbo any longer would, in our opinion, be seriously detrimental to them. *State ex rel Juv. Dept. v. McMaster,* supra; *State v. Blum,* supra. We conclude, as did the trial court, that the mother is unfit by reason of conditions not likely to change which are seriously detrimental to the children and that integration of the children into the home of this parent is improbable in the foreseeable future. ORS 419.523.

This court has previously ruled that *State ex rel Juv. Dept. v. Wade,* supra, will not be applied retroactively. *State ex rel Juv. Dept. v. Gonzalez,* 21 Or App 103, 533 P2d 1382, Sup Ct *review denied* (1975). Thus, appellant-mother's second assignment of error is not pertinent.

Affirmed.