Argued and submitted November 27, 1990, reversed and remanded with instructions
February 13, 1991

In the Matter of
Buddy Lee Boren, a Child.

STATE ex rel JUVENILE DEPARTMENT
OF BAKER COUNTY
and Children's Services Division,
*Appellants,*

*v.*

Bill Loren BOREN,
*Respondent.*

(J-2561-A; CA A65501)

806 P2d 149

Katherine H. Waldo, Assistant Attorney General, Salem, argued the cause for appellants. With her on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General.

Steven H. Gorham, Salem, argued the cause and filed the brief for respondent.

Before Buttler, Presiding Judge, and Rossman and De Muniz, Judges.

DE MUNIZ, J.

## DE MUNIZ, J.

The state appeals from the dismissal of a petition to terminate the parental rights of father. The trial court made findings, to which we give considerable weight, because it had the opportunity to observe the witnesses firsthand. *See State ex rel Juv. Dept. v. Geist,* 310 Or 176, 194, 796 P2d 1193 (1990). However, our review is *de novo,* ORS 419.561(4), and we must independently assess and evaluate the evidence.

These facts are undisputed. Father and mother were married when the child was born on January 21, 1984. Father participated in caring for the child until he and mother divorced in March, 1985. The judgment of dissolution awarded mother custody of the child and provided father visitation rights; however, it did not require him to pay child support. Father went to live with his mother in Baker. The child remained in Baker with mother and father saw the child regularly until August, 1985, when mother requested that Children's Services Division (CSD) place the child in foster care. Soon thereafter, the juvenile court placed the child in CSD's custody for placement in foster care. Father gave CSD his mother's address for correspondence to him, and he has continuously refused to give CSD any other address.

Father took a job as a long-haul truck driver about the time that CSD got involved with the child. Father and his mother visited the child at the CSD office on December 24, 1985, and gave him gifts. Father visited the child three times at the CSD office in Baker during 1986, once with the child's mother in May and twice with his own mother in September.

Some time in the latter part of 1985, father was arrested on sodomy and menacing charges. In February, 1986, he was acquitted on the sodomy charge and convicted on the menacing charge. As a result of the conviction, he was sent to jail and later released on probation. He subsequently violated probation and was returned to jail. By early 1987, he had completed his sentence and was released from custody.

In March, 1987, CSD returned the child to mother's care under its supervision. Mother had remarried and moved to Philomath. Father was unemployed or in jail for most of 1986 and the early part of 1987. Father saw the child only two or three times during the year that the child was with mother

in Philomath. On each of those occasions, mother brought the child to father while she was visiting her parents in Baker. On all but one of those occasions, the child was asleep in the car and father did not wake him. Father contacted neither CSD nor mother during the time that the child was in Philomath.

Mother returned the child to CSD on March 9, 1988, and released him for adoption on April 14, 1988. She informed father that she had returned the child to CSD. The child was placed in foster care in the Corvallis area, where he remained for three months.

In April, 1988, father got a job in Pasco, Washington, where he worked for about six months. During that time, he lived in his truck in his employer's parking lot. While he was in Pasco, CSD caseworker Okita sent him a letter that inquired whether he would release the child for adoption. If he would not, it outlined the conditions that CSD expected him to meet before he would be considered as a resource to care for the child. The conditions required father to make monthly child support payments; submit to an alcohol and drug use evaluation; undergo treatment for alcohol or drug use, if recommended by the evaluator; commit no further violations of law; attend parenting classes; write the child weekly; and schedule regular visitation.

On May 16, 1988, father telephoned Okita in response to her letter. He told her that he could not afford to make the child support payments and that he would not submit to an alcohol and drug evaluation, because he did not have a problem. He did not mention visitation.

After he contacted Okita, who was in Corvallis, father telephoned another CSD caseworker, Dickison, who was in Baker. Father requested that his mother be allowed to visit the child, but he did not request visitation for himself. Dickison responded that "[CSD] would arrange visits at any time for [father], and that he may bring his mother with him. But that [CSD was] not working with [her]." Dickison also restated the conditions previously outlined in Okita's letter. In June, 1988, the child was placed in foster care with a family in Baker. He has remained with the family since that time.

On March 3, 1989, a juvenile court hearing was set to give "father the opportunity to present a plan for reunification

with his son." That court found that "father was served with notice of [the] proceedings and failed to appear[.]" It ordered CSD to "go ahead with their [sic] plans for termination of parental rights."

In April, 1989, Pike, a CSD consultant, sent father a letter. By that time, father was working as a farmhand. Pike inquired whether father would consider voluntarily releasing the child for adoption and outlined several points strongly suggesting that he release the child. He also gave father his telephone number, suggested that father call collect and offered to meet him at a location of his choice if he wanted to discuss the matter. Father never responded.

The petition for termination of father's parental rights was filed on July 31, 1989. In December, 1989, father tried to send two cards and a gift to the child. However, they were not given to the child, because CSD decided that it would not be in his best interests. On February 13, 1990, father's attorney contacted CSD in Baker and requested visitation for father, but CSD denied the request. The hearing on the petition for termination occurred on April 25, 1990.

The allegations in the petition correspond to several different subsections of *former* ORS 419.523.[1] The trial court concluded that the state had failed to establish any allegations by clear and convincing evidence, *see* ORS 419.525(3), and that, even if the state had proven those allegations, "it would be an abuse of discretion to grant the Petition."

The state alleged that father has physically and emotionally neglected the child, has failed to "maintain a suitable or stable living situation for the child so that return of the child to the parent is possible" and has failed to present a viable plan for integrating the child into his home.[2] Those allegations correspond to *former* ORS 419.523(2), which provided, in part:

---

[1] Since the petition was filed, *former* ORS 419.523 has been amended and the subsections that we cite have been renumbered. Or Laws 1989, ch 907, § 2.

[2] The state included allegations that father abandoned the child, which correspond to *former* ORS 419.523(2) and (4). However, the state has not provided evidence of conduct that "evinces a settled purpose to * * * relinquish all parental claims to the child." *See Omlie et ux v. Hunt,* 211 Or 472, 482, 316 P2d 528 (1957). Therefore, we find that the state failed to prove those allegations.

"The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable in the foreseeable future due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"* * * * *

"(d) Physical neglect of the child.

"(e) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

The evidence regarding father's attempts to contact the child and CSD is conflicting. The trial court did not make any findings concerning the credibility of either father or CSD caseworkers who testified. Caseworkers testified that their records would document any attempted contacts by father. CSD records in evidence establish that father did not attempt to contact the child through CSD between September, 1986, and December, 1989. The records also reveal that father contacted caseworkers involved with the care of the child only twice during that period, both times in May, 1988, after Okita's letter to him. Father visited with the child only once during that period, in 1987, when mother brought the child to father.[3] CSD's records and the caseworker's testimony on this issue are more persuasive than father's testimony that, during this period, he attempted numerous contacts and visitations through CSD but was rebuffed or ignored.

■ Father argues that CSD interfered with his attempts to contact the child and the agency. The court found that CSD

"mishandled [the] case in the following particulars:

"(a) By taking the position that [father's] parental rights should be terminated shortly after CSD was granted the care, custody, and control of [the child] on October 17, 1985.

---

[3] Father did not visit with the child on the one or two other occasions when mother brought the child to him, because the child was asleep.

"(b) By failing to take adequate steps to determine whether [father] could become an adequate resource for [the child]. In April, 1989, CSD attempted to pressure [father] into releasing [the child] for adoption.

"(c) By failing to properly notify [father] of court appearances involving [the child]. [Father] received notices of these court appearances either on the day of the hearing or shortly following the hearing. As a result, [father] was denied his right to be heard on issues involving [the child]."

Notwithstanding those facts, father's neglect cannot be excused. CSD's position that his parental rights should be terminated, Pike's letter to him strongly suggesting that he release the child for adoption and CSD's failure to notify father timely regarding court appearances did not preclude father from at least attempting to contact the child or CSD.[4] *See State ex rel Juv. Dept. v. Kirk,* 44 Or App 381, 606 P2d 634, *rev den* 289 Or 45 (1980); *State ex rel Juv. Dept. v. Shelton,* 29 Or App 211, 214-15, 562 P2d 1225 (1977). CSD caseworkers provided credible testimony that they encouraged father to schedule visits and to contact the child and caseworkers.

■ Father contends that some of CSD's conditions for considering him as a resource for care of the child were unreasonable. We agree. The state has not established that the conditions concerning support payments and an alcohol and drug evaluation were reasonable under the circumstances, given father's meager income and the lack of evidence of any alcohol or drug abuse. However, the conditions that he attend parenting classes, write to the child and schedule visitation with him were reasonable under the circumstances and could have been helpful in reuniting him with the child. *See State ex rel Juv. Dept. v. H.,* 62 Or App 288, 291-92, 659 P2d 1027 (1983); *State ex rel Juv. Dept. v. Kirk, supra.* We conclude that CSD did not interfere with father's attempts to contact the child and the agency. Father failed to provide physical and

---

[4] The court's "finding of fact" that CSD failed "to take adequate steps to determine whether [father] could become an adequate resource for [the child]" is a conclusion not supported by the facts. As we subsequently discuss, CSD outlined helpful conditions for father to meet in order to be considered as a resource and CSD personnel made several attempts to contact him regarding his intentions. Father failed to respond to, and hindered, those efforts. Although CSD might have done a better job, it took adequate steps under the circumstances to determine if father could become a resource.

emotional care for the child and failed to show any interest in whether the child's physical and emotional needs were met for a substantial period. *See former* ORS 419.523(2)(d).[5]

 The record also demonstrates that father has a history of unstable employment and living conditions. He testified at the hearing that he was unemployed and has had difficulty finding and keeping jobs; those conditions appear unlikely to change. We recognize that unstable living conditions and unstable employment are not necessarily impediments to adequate parental skills and cannot provide the sole basis for termination of parental rights; however, those facts may be considered in conjunction with a child's special needs for stability. *See State v. McMaster,* 259 Or 291, 302-04, 486 P2d 567 (1971); *State ex rel Juv. Dept. v. Geist, supra* n 5, 97 Or App at 14.

Pike, the CSD consultant and a treatment coordinator at a residential treatment center for children with attachment disorders, testified that the child demonstrated behavioral problems associated with an attachment disorder. According to him, the major problem for such children "is that they do not trust that adults can care for them[.]" Around the end of 1987, the child was considered for placement at the residential center. However, it was decided that out-patient therapy would be sufficient. One of the factors in that decision was the strength of the foster family, with whom the child has been placed since June, 1987. Pike testified that he saw the child about three months before the hearing and observed that

"he's very ambivalent about the [foster family]. He trusts them one time, the next minute he doesn't. And when he doesn't, he * * * disobeys, he's hyperactive, he's off the wall, he doesn't go to sleep, he * * * breaks toys[, he is] destructive with things and so on."

Pike's testimony demonstrates that the child has behavioral problems that require special care, stability and a sense of belonging unconditionally to a family as soon as possible.

---

[5] We have generally considered physical neglect of a child as a factor for termination of parental rights only when a child was physically neglected by parents who had the child under their care. *See, e.g., State ex rel Juv. Dept. v. Geist,* 97 Or App 10, 775 P2d 843 (1989), *aff'd* 310 Or 176, 796 P2d 1193 (1990). However, we can nonetheless consider that factor under these circumstances. *See former* ORS 419.523(2)(d).

■ CSD caseworkers testified that father has not presented any viable plan to care for the child's special needs in integrating the child into his home. In CSD's contacts with father and attempts to contact him through his mother, CSD has stressed the importance of presenting a plan to care for the child; father has failed to respond. Although father's mother has expressed a desire to care for the child, *father's* conduct is the focus of our consideration. *See State ex rel Juv. Dept. v. Gonzalez,* 21 Or App 103, 111-12, 533 P2d 1382, *rev den* (1975). On the basis of father's history of neglect of the child, unstable employment and living conditions and his failure to present a plan to care for the child's special needs, we conclude that father has failed to "effect a lasting adjustment" of his conduct and conditions so that integration of the child into his home would be possible. *See former* ORS 419.523(2)(e).

■ As we previously discussed, CSD outlined conditions for father that would have been helpful in reuniting him with the child. Dickison repeated those conditions to father. Pike attempted to communicate to father through his mother the importance of visitation and that he develop a plan for care of the child.[6] Father failed to respond to any of CSD's reasonable conditions and most of its efforts to contact him, thus hindering CSD's efforts. Moreover, his failure to contact CSD for a considerable period and his apparent general distrust of government agencies demonstrate that father is not likely to respond to those conditions in the future. Under the circumstances, we find that CSD's actions constituted "reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected." *Former* ORS 419.523(2)(e); *see State ex rel Juv. Dept. v. Robinson,* 31 Or App 1097, 1101-02, 572 P2d 336 (1977), *rev den* 281 Or 531 (1978); *State ex rel Juv. Dept. v. Gonzalez, supra,* 21 Or App at 110-11.

The trial court found that father has expressed a desire to integrate the child into his home. However, under the totality of the circumstances, including father's history of physical and emotional neglect of the child, his failure to adjust his living conditions and his failure to provide a plan to

---

[6] Although Pike's April, 1989, letter was discouraging and generally not helpful, it does not excuse father's neglectful conduct.

meet the special needs of the child, father is "unfit by reason of conduct * * * seriously detrimental to the child[.]" *Former* ORS 419.523(2). Moreover, his failure to respond to CSD's conditions and efforts to contact him persuades us that "integration of the child into [father's] home * * * is improbable in the foreseeable future[.]" *Former* ORS 419.523(2); *see State ex rel Juv. Dept. v. Geist, supra* n 5; *State ex rel Juv. Dept. v. Robinson, supra; State ex rel Juv. Dept v. Gonzalez, supra.*

The state also alleged that father failed in these respects for one year before the filing of the petition:[7]

"(a) Failure to provide care or pay a reasonable portion of substitute physical care and maintenance while custody was lodged with others.

"(b) Failure to maintain regular visitation or other contact with the child which was designated and implemented in a plan to reunite the child with the parent.

"(c) Failure to contact or communicate with the child.

"(d) Failure to contact or communicate with the custodian of the child.

"(e) Failure to implement a plan designated to lead to the integration of the child into the parent's home."

Those allegations correspond to *former* ORS 419.523(3):

"The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents have failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child for one year prior to the filing of a petition. In determining such failure or neglect, the court shall consider but is not limited to one or more of the following:

"(a) Failure to provide care or pay a reasonable portion of substitute physical care and maintenance if custody is lodged with others.

"(b) Failure to maintain regular visitation or other contact with the child which was designed and implemented in a plan to reunite the child with the parent.

"(c) Failure to contact or communicate with the child or with the custodian of the child. In making this determination,

---

[7] The state relied on the one-year period "between July 30, 1988, and July 30, 1989."

the court may disregard incidental visitations, communications or contributions."

The state failed to establish that father did not pay a reasonable portion of the cost of substitute physical care and maintenance for the child without reasonable and lawful cause, because it did not demonstrate that father could have reasonably paid any amount, given his meager income.

We address the allegations of the state's petition under paragraphs (b)-(e) together, because they involve similar issues. The conditions that CSD outlined for father were part of a plan to reunite the child with him. He failed even to attempt to comply with the reasonable conditions that he schedule visitation with the child, write to him and attend parenting classes. Moreover, father failed to contact the child and, as we noted previously, CSD caseworkers offered credible testimony that he failed to make other than incidental contact with CSD, the custodian of the child, during the statutory one-year period. The state proved its allegations under paragraphs (b)-(e) and established by clear and convincing evidence that father failed to "provide for the basic physical and psychological needs of the child for one year prior to the filing of [the] petition" or even to inquire whether those needs were met. *Former* ORS 419.523(3).

Father contends that he had a reasonable and lawful cause for his failures in those areas. He contends that he did not attempt to visit the child, because it was his impression that CSD had conditioned his right to visit the child on his fulfillment of the conditions that he make support payments and submit to an alcohol and drug evaluation. He would not have been precluded from at least writing to the child, even if CSD had so preconditioned visitation. However, credible evidence demonstrates that it had not. Okita and Dickison testified that visitation was not conditioned on his fulfillment of any of the other conditions. Given father's failure to express any desire to visit the child for a substantial period and CSD's efforts to try to get father to communicate with both the agency and the child, we find that father's testimony is not credible on this issue. As we have previously discussed, the areas in which the trial court found that CSD "mishandled [the] case" did not excuse father's failures. Moreover, father's financial condition and his living situation did not preclude

him from at least attempting to contact CSD or the child or schedule visits with the child. Father had no reasonable and lawful cause for his failures that continued throughout the statutory one-year period. *Former* ORS 419.523(3); *see State ex rel Juv. Dept. v. Kirk, supra; State ex rel Juv. Dept. v. Shelton, supra.*

Finally, the state alleged that "it is in the child's best interest to be freed for adoption and be provided with the security of a permanent home." We recognize that the biological tie of father to his son is of great importance; however, once the statutory grounds for termination have been established, our next consideration must be the child's best interests. *See State ex rel Juv. Dept. v. Geist, supra,* 310 Or at 189; *see also State v. McMaster, supra; State v. Blum,* 1 Or App 409, 416, 463 P2d 367 (1970). The trial court found that "it is in [the child's] best interests to establish a relationship with his grandmother[.]" That, however, is not the relationship at issue. Instead, it is the child's best interests in relation to father's parental rights that must be determined. *See State ex rel Juv. Dept. v. Gonzalez, supra.* It is in the child's best interests to be integrated into a family, if possible. Considering all of the circumstances, we conclude that termination, rather than relying on the possibility that the child might someday be returned to father, is in the child's best interests. *See State ex rel Juv. Dept. v. Wagner,* 21 Or App 396, 402-03, 535 P2d 102, *rev den* (1975), *cert den* 424 US 924 (1976); *State v. Blum, supra.*

Reversed and remanded with instructions to enter judgment terminating father's parental rights.